## PETERS *v.* BORST.

(*Supreme Court, Special Term, Oneida County.*   November, 1889.)

1. COLLEGES AND UNIVERSITIES—MANUSCRIPT OF PROFESSOR.
   A college, in the absence of a special agreement, has no right to manuscript prepared for publication by a professor, as the result of his literary labors, though he is aided in his work by the facilities afforded him by the college as professor.

2. REPLEVIN—LITERARY PROPERTY.
   In replevin for literary manuscript the evidence showed that plaintiff, who was a college professor, had conceived the idea which led to its preparation, and had for 30 years gathered material for it; that defendant was a young man, who had, a short time before the preparation of the manuscript, been a student at the college; that he and plaintiff labored together on the work, plaintiff directing the sources from which the work should be taken; that plaintiff, by his discriminating examination and correction of the manuscript, gave it its really great value; that afterwards defendant, thinking he could conduct the work alone, worked without plaintiff's help, and, with his and his sisters' executive skill and labor, continued and increased the work.   *Held* that, in the absence of a definite contract, plaintiff was entitled to all the manuscript which was prepared under his supervision and in accordance with his directions, and the material furnished by him.

Action of replevin by Christian H. F. Peters against Charles A. Borst, to recover manuscript prepared by plaintiff and defendant together, with the design of publishing an astronomical work to be known as the "Star Catalogue."   Plaintiff was at the time, and had been for a number of years, a director of the Litchfield Observatory at Clinton, N. Y.   Defendant was a young man, and, a short time before the transactions referred to in the opinion took place, had been a student under plaintiff.   Plaintiff and defendant began together to prepare the material for the catalogue, under the supervision and direction of plaintiff.   After the work had progressed to a considerable extent, defendant did the work himself, using books and periodicals which had been furnished him by plaintiff.   Plaintiff seeks to recover the manuscript in defendant's possession.

*E. D. Mathews* and *Elihu Root*, for plaintiff.  *William Kernan* and *Francis Kernan*, for defendant.

WILLIAMS, J.  I am not inclined to hold the book and manuscript in question, or any of them, or the work intended to be published as a "Star Catalogue," belonged to the Litchfield Observatory or to Hamilton College. There would, it seems to me, be a great injustice in holding that, for the very small compensation paid to and received by the plaintiff since he became connected with the observatory, in 1858, the observatory or the college acquired the right to have and appropriate the results of his literary labors as an author during all the years.  His employment might have been made upon the condition that whatever he should produce as an author should become the property of his employer, and then all the works he produced would have belonged to the observatory or the college, but I do not find any evidence warranting the finding such an agreement was ever made.  The same suggestion is applicable to the defendant as to any work performed by him as an author. The results of such labors I cannot hold to belong to the observatory or college. These suggestions seem to be in accordance with well-settled principles of law.  In Wood on Master and Servant it is said, (page 198:)  "If a servant makes an improvement in machinery or invents a machine, the master is not entitled to the patent as against the servant unless the servant was hired for that purpose."  In *Hapgood* v. *Hewitt*, 119 U. S. 226, 7 Sup. Ct. Rep. 193, it was held that an employe of a corporation could not be compelled to convey to the corporation title to letters patent obtained by him for an invention made while he was in its employ; "it not appearing  *  *  *  there was any agreement between the employe and the corporation that it was to have the title to the invention, or to any patent he might obtain for it."  In *Burr* v. *De La Vergne*, 102 N. Y. 415, 7 N. E. Rep. 366, it was held that one partner acquired no right or interest, legal or equitable, by reason, merely, of the copartnership relation, in an invention made by a copartner during the existence of the partnership, although the invention related to an improvement in machinery to facilitate the business of the firm, and although the inventor used the copartnership means in his experiments, and was bound by the copartnership articles to devote his whole time and attention to firm business.  But where, by agreement between the copartners, the firm was to have a joint right to any inventions, the partner to whom a patent for such an invention was issued might not claim the exclusive benefits thereof.  In this case there seems to have been no agreement that any production of these parties as authors should be the property of the observatory or the college.  The plaintiff acted as professor and teacher of astronomy in the college, and had the custody of the observatory, and the instruments and property connected therewith, and the defendant acted as his assistant; and, while the observatory and college might enjoy the benefits to be derived from having such men in their employ,—men who might become eminent and distinguished by reason of the mental labor and results they achieved,—it can hardly be claimed the observatory or college would become the owners of the work they might, as authors, produce and publish to the world.  The property in these works, so long at least as they remain unpublished, belonged to the authors and to them alone.  So that the real question to be determined here is not whether the observatory or college was the owner of these chattels,—the book and manuscripts in question,—but which one of these two parties was the owner thereof, and therefore entitled to their possession, when this action was commenced.  In this view of the case, I think it must be said the book Exhibit 2 was the property of the plaintiff, and he was entitled to its possession.  It was his in 1884, before the preparation of the other exhibits in question was made; and it is not claimed he ever gave it to defendant, or parted with its possession so as to prevent his demanding, and being entitled to, its return at any time.

We come, then, to consider the circumstances under which Exhibits 4 and 5 were made. The plaintiff testifies that in 1884 he determined to prepare a star catalogue from the materials he had in the books Exhibits 1 and 2, and such other materials as he might gather, and that he set defendant at work accordingly. That the star positions in Exhibit 1 were referred all to the epoch of 1859, and these went into Exhibit 4; that the star positions in Exhibit 2 were all referred to the epoch of 1875, and these went to Exhibit 5; that he (the plaintiff) selected other star positions from various periodicals, copying some himself, and marking or pointing out others in the periodicals to defendant, and directed these to be put into Exhibits 4 and 5; and some 900 star positions he (plaintiff) determined himself, and directed them to be put in Exhibits 4 and 5 by defendant; he gives in more or less detail the books and periodicals and sources from which, and the manner in which, he selected the star positions which he directed defendant to insert in these Exhibits 4 and 5; that he looked over the various sheets of Exhibits 4 and 5 from time to time, and corrected the entries therein, and all this was continued, as they had time and opportunity, down to the summer of 1886, just before the college commencement; that then he (the plaintiff) observed the pages of these two exhibits (4 and 5) were getting too crowded, of reason of the insertion of matter between the lines, and talk was had about copying the exhibits, so as to give them more room, and getting some one outside to do this manual labor,—the plaintiff to pay $100 for the work; that the plaintiff suggested a student, Hollister by name, as a person to employ, and defendant afterwards said Hollister could not do it, but his (defendant's) sister would do the work, and the plaintiff assented to this, saying defendant could then supervise the work a little.

Let us pause here in plaintiff's story, and observe what defendant testifies as to this period, and what the other evidence in the case shows. The defendant testifies that, during the first year he was in the observatory, plaintiff advised him to undertake some special work, and publish it, for the sake of his reputation; that he then suggested the preparing of a star catalogue, and called his attention to the materials he had accumulated in the book Exhibit 2; that in the spring of 1884 he (defendant) made up his mind to undertake the work of preparing and publishing a star catalogue, and when the plaintiff returned from Europe, in April, 1884, they talked about it together. That he (defendant) began the work in May, 1884, and continued it until February or March, 1885, extracting star positions from circulars and journals and publications, arranging them in regular order, and making computations thereon, and in this work made and prepared the manuscripts presented and known in the case as "Exhibits 22 to 45," both inclusive; that the plaintiff never saw these manuscripts, nor knew anything about them, until long after, in 1886, when he showed plaintiff one of them; that in March, 1885, he (defendant) prepared paper, which he purchased and paid for himself, upon which to make the manuscripts for the so-called "first edition," for the epoch of 1875; that he put into this the star positions he had extracted from circulars, etc., and also star positions extracted from the book Exhibit 2, and this is the manuscript known in the case as "Exhibit 5;" that plaintiff, when he called his attention to Exhibit 2, at first, had told him he might use the star positions entered in it, and he did use them accordingly; that, after preparing Exhibit 5, he (defendant) prepared the manuscript known in the case as "Exhibit 4," entering therein star positions taken from the book Exhibit 1, and from the Geneva observations; that Exhibit 4 was then much smaller than Exhibit 5, and at his request the plaintiff called his attention to star positions in the Santiago observations, and marked some, and he (defendant) extracted those, and a large number of others not marked, and entered them in Exhibit 4; that he did much other work, which he specifies, and points out errors and mistakes in Exhibits 1 and 2; that his work was thus completed down to August 1, 1885; that plaintiff never directed him to prepare Exhibits 4 and 5 from Exhibits 1

and 2, and had nothing to do with those manuscripts; that the first time plaintiff ever saw Exhibit 4 was in July, 1885, when he took it to plaintiff, and asked him to look it over with him, and see if he had any criticisms to make upon it, and that plaintiff did go over the manuscript with him, and made suggestions and corrections in it; that this was all done in one afternoon, and plaintiff had not seen this manuscript before,—could not have seen it, because the manuscript had not been at the observatory, but at the defendant's house, in the village; that plaintiff never had seen Exhibit 5 before that time, either; that Dr. Hall visited plaintiff in July, 1885, at the observatory, and he (defendant) then took some portions of Exhibits 4 and 5 to the observatory, to show Dr. Hall what he was doing; that he showed Dr. Hall these portions of the exhibits in plaintiff's presence, and asked his advice with reference to the work; that Dr. Hall looked them over, and gave him some advice with reference to the work; that defendant told him it was his personal work, and that he was doing it for his own reputation; that Dr. Hall said it would be an excellent work, and valuable, and encouraged him to go on with it; that plaintiff sat by during this interview, and made some suggestions himself about the work; that the computations of the annual processions had not then been made, and defendant spoke about making them, and Dr. Hall advised him to do it; that his sister Emma, during the fall of 1885, and spring and summer of 1886, made the computations for both epochs, 1850 and 1875, and with the assistance of his sister Lucy, they were put into the manuscripts Exhibits 4 and 5, and these computations were in the manuscript presented and known in the case as "Exhibit 46;" that there were 5,900 star positions in Exhibit 4, and over 8,000 in Exhibit 5; that his sisters came to Clinton to live in April, 1884, and began their work on the manuscripts in the spring of 1885; that in the spring and summer of 1886 a second edition of Exhibit 4, the catalogue for 1850, was being made by his sisters; that the plaintiff never made any suggestions as to Exhibits 4 and 5 being crowded, but that in the summer of 1886, when the second edition for 1850 was being prepared, he remarked to plaintiff that he was making it, and it was no small task, and plaintiff asked why he did not get some poor student to do such work, his (defendant's) time was so valuable, and he replied his sisters did his copying; that no student's name was mentioned, and there was no talk about plaintiff's paying $100 for the copying at this or any other time. Prof. Burdick testifies that in 1885, just after Mr. Litchfield's death, at the observatory, he had an interview with defendant; that defendant showed him the charts of the heavens, and talked about the reputation they had given the plaintiff, and spoke of observations in connection with charts, and the computations in regard to those observations, and then said these were but a part of the work the plaintiff had done, and that he (plaintiff) had been for years collecting star determinations, and getting them in shape for publication, and he (defendant) was spending most of his time upon that work, and he (plaintiff) had in manuscript there what would give him, when published, greater reputation than the charts; and he pointed to the manuscripts on the table before him,—some sheets. He said the work was a compilation or collection of star positions which they had not observed; that if Harvard University, or any other such institution, had a work of that kind, it would see that it was for its reputation that it be published, and that this ought to be published; that the plaintiff hoped to get funds from Mr. Litchfield for the publication of it, and he did not know but the death of Mr. Litchfield would prevent the carrying out of the plaintiff's idea. Prof. Brandt testifies that late in 1885 he was at the observatory, and had an interview with defendant; that he then saw defendant working upon sheets of manuscript having the appearance of sheets in Exhibits 4 and 5; that defendant said he was working on the catalogue, and explained the nature of the work, saying it was not original work, but a compilation that required a great deal of care, accuracy, and labor; that witness observed he had before him foreign catalogues, especially the Astronomische Nachtrichten,—some un-

bound numbers,—and spoke to defendant about them, inquiring, with reference to marks he observed upon them, if the plaintiff marked them; that the defendant replied he did; that witness then said he should think defendant would find great difficulty in looking up the references, as he did not know much French, German, or other languages, and defendant replied he did, but when he got stuck the plaintiff fixed him up; that defendant then spoke of two other works of the plaintiff's, the Star Charts and the Solar Spot Observations, which he (defendant) had copied, and said these three great works were enough to complete any man's reputation; that defendant showed him the Star Charts, and spoke of the Solar Spot Observations, which he said he had copied, and said those two, with the catalogue,—and he pointed them to the manuscript which lay there,—were enough to complete any man's reputation; that defendant said the plaintiff himself had paid the expenses of publishing the Star Charts, but that the publication of the catalogue and the Sun Spot Observations would be very expensive, and the plaintiff's friends ought to bear that expense; that defendant said the plaintiff had urged him from the very beginning to become familiar with French and German, but he had never had a start in them; that witness subsequently saw defendant, very frequently, working upon the catalogue, and noticed that he had other books from which he was compiling, and sometimes saw him computing, and had conversations with him about the Star Catalogue, subsequently. Prof. Chester testifies to an interview with defendant in February, 1888, in which witness asked him about plaintiff's hiring Hollister, the student, to copy the catalogue, and defendant said "that about Hollister's copying the catalogue was all bosh,—was a trick,—that plaintiff knew better than that;" that witness asked if plaintiff did speak to him, (defendant,) offering to give Hollister $100 to copy this catalogue, and defendant replied: "Certainly; but it was all a trick." The defendant, in reply to the evidence of Profs. Burdick and Brandt, testifies that he cannot remember the details of the conversations they testify to, but he must have referred to a catalogue of zone stars to be published in connection with the charts of the heavens, if he spoke of a catalogue at all, as he never spoke of this Star Catalogue in question as the plaintiff's work at any time, or to any person. As to the evidence of Prof. Chester, defendant denies at least all recollection of the details testified to by the professor, and denies he conceded the plaintiff offered to pay $100 for copying the catalogue. Dr. Hall testifies defendant showed him the manuscript of the catalogue in question in August, 1885; he thinks it was at the observatory, but he does not remember that the plaintiff was present, or took any part in the interview; that defendant asked him to examine the work and make such criticisms as he thought proper as to its arrangement, and he did so; that he advised making new and larger sheets, and adding new columns; that witness, after examining the catalogue, remarked that it contained a great deal of work, and in reply defendant said it was his work; that plaintiff had advised him to take up and do some solid piece of work; that defendant showed him (witness) a book, (evidently Exhibit 2,) and said plaintiff had given that to him to assist him in the work, and he was doing the work for the reputation it would give him. The plaintiff denies he was present, or heard any such interview, or took any part in it. Dr. Hall testifies he had known the plaintiff for many years, and before November, 1886, had talked with plaintiff, and had correspondence with him about the publication of a star catalogue. Letters written and sent by Dr. Hall are produced in evidence. Dr. Hall testifies he is home secretary of the National Academy of Sciences. In a letter of March 21, 1886, he writes the plaintiff: "I have sent out notices of the meeting of the National Academy next month. Can you not come and stay with us this year? If your catalogue is ready, you might present it." And in another letter, of April 19, 1886, he writes: "We are sorry you cannot come on, and I was hoping that you would bring that catalogue, so that we might begin the printing next year; but next fall will do." And in another letter, of April 19,

1886, he writes: "The autumn meeting of the academy is to be held at Boston November 9, and I hope you will be there with the Catalogue of Stars." And in another letter, of October 8, 1886, he writes: "If you put off the presentation of your Star Catalogue, it will delay the printing a year. I think you better present it, then work on it till December, send it to Prof. Marsh, and keep up your work on it until it goes to the printer,—say next March." Then following these letters, at the meeting of the National Academy at Boston, in November, 1886, plaintiff, as Dr. Hall, who was present, testifies, read a paper entitled "Catalogue of Stars from Positions in Various Astronomical Periodicals," and it was discussed; and defendant saw a report of this paper in the New York Tribune immediately after. Defendant testifies he read the report of the paper in the Tribune before the plaintiff returned home from Boston, and had some unimportant talk with him about it on his return home; that he then at first suspected plaintiff thought the work was his, but this suspicion was soon entirely removed by plaintiff's paying no more attention to the catalogue. The Exhibits 22–46, which defendant testifies he made before Exhibits 4, 5 were made, seem to be manuscripts in which the materials were accumulated in rough, which went into Exhibits 4, 5 afterwards.

I have thus, as briefly as possible, stated the claims of the parties, and referred to the evidence given in their behalf as to the condition of things in 1886, when, plaintiff claims, talk was had about procuring Exhibits 4 and 5 to be copied, and a second edition thereof to be made. At that time but little work had been done on the catalogue by defendant's sisters. They had made some computations, and inserted them in Exhibits 4 and 5, and, it is claimed, had begun, or were about to begin, work on the new edition of Exhibit 4; but it does not appear that plaintiff then had any knowledge of this work done by them. The defendant had done considerable work in accumulating materials for, and in preparing and putting these materials together in Exhibits 4 and 5; and the plaintiff had done more or less towards furnishing materials for the work, aside from the matter in Exhibits 1 and 2, and in directing or advising as to the work. The great amount of labor done by defendant and his sisters upon manuscripts which have been produced upon the trial, in considerable abundance, was performed subsequent to this time to which we are now referring. There is much in the evidence thus far in the case to incline one towards the plaintiff's claim that at the time referred to the work in question was regarded by both parties as the work of plaintiff, rather than of the defendant. The position of the parties is unfavorable to defendant's claim made on the trial. The work was the idea, the conception of the plaintiff, long years before; and ever since then he had patiently accumulated materials for the work. He says in 1884 he concluded to put the work in shape, and that he set defendant at work upon it as his assistant. The defendant was merely an assistant, a beginner in the science of astronomy; and he seeks to claim the work of his chief, his superior, as his own. The claim does not strike one pleasantly. The defendant is not satisfied to have credit given him for his part in the work. He wants the whole credit of the work as his own. In order to support such a claim as he thus makes, he should have quite satisfactory evidence of it. He puts his word—his evidence—against the plaintiff's, and challenges the truthfulness of the claim made by him. He has little in the evidence to corroborate him, and considerable to contradict his claim. The evidence of Profs. Burdick and Brandt is directly against him. They testify to express statements made by him in 1885 that the work was the work of the plaintiff, and they give these statements in such detail as to leave little doubt but that defendant then understood the work to be the plaintiff's, upon which defendant was working as assistant merely. The defendant attempts to avoid the effect of their evidence by claiming he referred to another catalogue rather than this one; but their evidence is too clear, and is answered too vaguely by defendant, to permit of such an explanation. If they are truthful, defendant could at that

time have had no idea of appropriating this work to himself, or claiming it as his own work rather than that of the plaintiff. It is said his talk with Dr. Hall shows he regarded the work in August, 1885, as his own work. If he had such a talk, it would show at least that he was then claiming the work as his own; and if, as he claims, the plaintiff was present and made no objection, it would show both of them so understood it. The plaintiff, however, denies he was so present, and Dr. Hall does not recollect he was. So that doubt is thrown upon the evidence of the defendant that he was so present. But beyond this, the letters written by Dr. Hall to plaintiff in 1886, and the occurrence at the National Academy in Boston in November, 1886, lead us to doubt the correctness of Dr. Hall's remembrance of the interview he had with defendant. I am unable to perceive how Dr. Hall could have understood during 1886 that this work was defendant's, rather than plaintiff's, in view of his letters, and the occurrence at Boston in the fall, with reference to the catalogue in question. His letters clearly indicated he regarded the catalogue as the plaintiff's work in 1886. It does not appear anything occurred between August, 1885, and the spring of 1886, to change Dr. Hall's opinion as to who was really the author of the work. It is very likely letters were written by plaintiff to Dr. Hall at the time Dr. Hall wrote his letters to plaintiff, and it would be strange if in such letters there was not more or less said with reference to this catalogue. None of these letters are produced. If Dr. Hall in 1886 understood defendant's claim to the catalogue as he now testifies to it, how does it happen that nothing was said or written by him to plaintiff with reference thereto? The catalogue was evidently regarded by Dr. Hall as a work of considerable consequence, and he was writing to plaintiff all through 1886 about it as his work. If defendant, plaintiff's assistant, had made such a claim to the work as his own personal work as Dr. Hall now testifies to, how did it happen that the doctor never mentioned this claim to the plaintiff? While it is not likely Dr. Hall intends to state anything untruly, still there is such an improbability in his evidence, viewed in the light of his letters, as to lead one to conclude his recollection of the interview of August, 1885, is at fault. More than this, the evidence of Dr. Hall and his letters show clearly that plaintiff, all through 1886, must have regarded the work as his, rather than the defendant's. Dr. Hall was not writing the letters designating the catalogue as plaintiff's work, based upon his talk with defendant in 1885, in which defendant stated it was his own personal work. These letters of Dr. Hall must have been based upon talks or correspondence with plaintiff in which the work was spoken or written of as his (plaintiff's) work.

If the case rested alone upon the evidence so far as we have now examined it, there could be little doubt, I apprehend, as to the conclusion which should be arrived at. We should, however, examine the remaining evidence, as to the years 1886 and 1887, until the trouble developed between the parties. One prominent feature of this branch of the case, on the part of the defendant, is the great amount of labor performed by the defendant, and more especially by his sisters. Only one of the manuscripts of this period is claimed by the plaintiff, Exhibit 6, but other manuscripts in great abundance were produced in court on the trial, and great labor had evidently been performed upon such manuscripts; and the claim and argument made by the defendant and in his behalf was and is that all this labor would not have been performed if the defendant had understood the work was the plaintiff's rather than his own. It is not claimed the nature or extent of this labor was brought to the knowledge of the plaintiff. He was only shown some of the first sheets of Exhibit 6. This argument was designed, and was liable, to have considerable effect upon the determination of the real issue involved in the case. Very much of the labor in these years was performed before Exhibit 6 was prepared. What defendant calls "second editions" of Exhibits 4 and 5 were prepared. The second edition of Exhibit 4 is known in the case as "Exhibit 20," and is said to con-

tain more than 10,000 star positions. The work upon these second editions was mostly done by defendant's sisters, who, under defendant's direction, extracted star positions from various sources, made computations thereon, and entered the whole in the manuscripts; and then, in 1887, between spring and fall, Exhibit 6, which defendant calls the "third edition of Exhibit 4," was prepared. Some sheets of this were presented to, and examined and corrected by, plaintiff, but defendant refused to present or submit to plaintiff the balance of the sheets of this exhibit. Considerable other labor upon the work was done during these years without the knowledge of the plaintiff; and finally, upon defendant's refusal to bring back to the observatory the manuscripts which plaintiff did have knowledge of, the question of the interests of the parties in the catalogue was brought up and discussed, this trouble developed, and this suit resulted. The plaintiff evidently regarded Exhibit 6 as the next work done on the catalogue after Exhibits 4 and 5, and supposed Exhibit 6 was made from Exhibit 4, and accumulations of materials from other sources after Exhibit 4 was prepared. All the plaintiff seeks to recover of these manuscripts are Exhibits 4 and 5, which he was directly connected with the preparation of, and Exhibit 6, which he understood was made up largely from Exhibit 4 by the merely manual labor of copying, and for which labor he had agreed to pay the $100. The other manuscripts were made without his knowledge, and are, therefore, not important to be considered here, except as to their effect upon the question in issue, by reason of the great labor performed upon them.

Whatever the interest of plaintiff was to be in the catalogue, it is not disputed but that the defendant would have actual credit and reputation for whatever he actually did in labor upon the work. He could not have the credit or reputation of having conceived the idea of such work, because that would not have been true. He could not have the credit or reputation of having himself selected the sources from which the stars were to be extracted, because that would not have been true. He could not have the credit and reputation of the nice discrimination in selection of star positions for the catalogue, and the absolute correctness of the work, because that would not have been true. The conception of the work, the original selection of the sources from which star positions were to be selected, the nice discriminations as to the star positions to be selected or retained in the work when published, the absolute correctness of the work, were due to the plaintiff, and his great knowledge and experience. But the great labor upon the work, the executive ability displayed in working out the conception of such a work, the untiring industry exhibited in preparing it for publication, were defendant's, aided by his sisters; and all the credit and ability exhibited in these respects belonged, not to the plaintiff, but to defendant, and could not have been properly taken from the defendant. It is possible that, for just the credit and reputation in connection with the work that the defendant was really entitled to, he would not have performed the work he did by himself and his sisters upon the catalogue. But it was all he was entitled to, in any event. The world will deal with all of us justly when it gives us credit for just what we have done. It will deal with some one unjustly when it gives some one credit for what he has not done. If the great labor performed upon this catalogue by defendant and his sisters is to be regarded as evidence that defendant considered the work as entirely his own personal work, still it could not be regarded as evidence that the plaintiff, who had no knowledge of this great labor secretly done, so regarded it. Whatever defendant's understanding with reference to the work may have been originally, it is not improbable that at some time, as early as 1886, he determined to claim the work as his own, and that from that time on he so arranged and carried on the labor as to give color to this claim; but, if the plaintiff still regarded the work as his, and did not voluntarily surrender it to defendant, then no amount of labor thereafter performed by defendant or his

sisters without plaintiff's knowledge could operate to deprive plaintiff of his interest in the work, or to legalize or justify defendant's attempted misappropriation of the work himself. It seems to me very doubtful if plaintiff, down to the time the trouble developed, had any idea of surrendering to defendant his own interest in the work, or had any idea that defendant claimed the work as his own personal work to the exclusion of all interest of plaintiff in, or credit or reputation for, the work. All plaintiff now asks for is to have whatever of interest, credit, or reputation belongs to him in connection with the work. It appears to me the effect of the defendant is to appropriate to himself credit and reputation which does not properly belong to him, but to the plaintiff.

In 1887 the plaintiff was in Europe for some months, and some letters passed between the parties. Of these a number have been produced and put in evidence, and one or two of plaintiff's letters have not been produced or put in evidence by defendant. None of these letters refer very clearly to the issue we are considering. In his letter of May 9, 1887, plaintiff wrote from Paris: "I have worked pretty steadily at the National Library, which indeed is very rich in MSS. Shall finish to-morrow." Then, in his letter of May 25, 1887, plaintiff wrote from Flensburg: "I regret that I forgot in my last to ask you how far we have in our observatory the Geneva observations. I had forgotten it. At Paris I met the present director of the Geneva Observatory, Mr. Gautier, and he promised me to send us all the following years that are wanting in our library. Therefore I beg you to give me at early convenience notice which is the last year of those observations we have. In the mornings I am busy in putting in order the copious notes for the old Star Catalogues I took at the Paris Library," etc. Then defendant, in a letter written May 7, 1887, said: "I have taken the stars out of the remaining volumes of the Nachtrichten, and have them reduced. I am working at the reductions of the Geneva and Königsberg stars. I hope you will come across those of Geneva for 1850. The work with the class will prevent my getting on quite so fast as I otherwise would with this work. Still I hope to have it ready so you can write the preface when you get back. It will be rather pleasant to turn from this work to your original observations." And then, in a letter written June 11, 1887, defendant said: "The Geneva observations in the observatory library are from 1841–1849, inclusive. It will be good to have the observations for the year 1850 to complete what we have from Cambridge of the Geneva stars. You will remember that year was lacking in the volume Professor Pickering sent. The latter numbers of the different journals have quite a number of new star places. As soon as I get through with the class, I will have more time to complete the reductions." And then in another letter, written July 16, 1887, defendant said: "Since the term closed I have turned my attention entirely to the reductions, and am now at the Geneva stars. So those you sent came in just at the right time. I am glad to get back entirely into the observatory, and forget, as far as possible, all the annoyances outside. I will be very glad when you get back." These extracts, it will be seen, give us little light with reference to the understanding of the parties as to the catalogue in question. The defendant carefully kept from plaintiff the fact that he and his sisters were engaged in the great labor now presented in court, and that he and they were working late on into the night. His letters to plaintiff rather carry the idea he had had but little time for the work, but at last, the term of college being closed, he would have more time to devote to this particular work. I am at a loss to understand why, during these years, defendant was so carefully concealing from plaintiff the manner and extent to which he and his sisters were pushing this work, consistently with the honesty of his claim that plaintiff understood the work was his (defendant's) own personal work. If plaintiff did so understand it, why was defendant so careful to keep every-

thing away from him? Why were all the manuscripts carefully kept away from the observatory? Why all this secrecy? If defendant had formed the design to claim the work as his without the consent of plaintiff, and knowing plaintiff regarded it as his, then I can understand why the work, while being pushed so vigorously by defendant and his sisters, was kept so carefully concealed from plaintiff.

I have given considerable time and consideration to this case because it is an important one, and an unpleasant one, and I have desired to arrive at a correct conclusion,—one that should do justice to both parties; and I can, as a result of my labors, arrive at but one conclusion, and that favorable to the plaintiff. Fortunately, it is not often we have to deal with such controversies as this, in which the real question in issue relates, not to money considerations, but to the credit to be given parties for scientific or literary productions. It seems to me, as I have already suggested, that justice can only be done in such a case by giving to each party credit for just what he has done with reference to the work in question. In doing this, we have little trouble in this case. There can be little doubt that this work was conceived by the plaintiff. For over 30 years he kept it in mind, and was patiently gathering material for it. There can be little doubt but plaintiff's mind directed the sources from which, largely, the materials for the work should be taken as the work progressed, up to the year 1886, at least, and that his discriminating examination and correction of the manuscripts Exhibits 4 and 5 gave them their real great value. Evidently the defendant then came to believe himself competent to go on alone, if not to criticise and correct his former master and teacher; and from that time on the work grew in size,—in volume,—under defendant's and his sisters' rapid executive skill and labor. That it continued to be as valuable as correct, we must be permitted to doubt. On the trial the defendant exhibited to the full extent his appreciation of his own ability, especially in his rather sweeping and severe criticism of the plaintiff's work. The effect of this upon the court was not favorable to the defendant's case. The plaintiff has given his whole life to his chosen work, —has become eminent in the astronomical world. The defendant only a few years ago began the study of astronomy. His growth, in his own estimation at least, has been very rapid, and now so soon he feels himself fully competent to criticise and correct his old master and teacher. We have all been young men, and some of us have since grown older; and we realize that young men are aspiring, and often know more when they are young than they do when they are grown somewhat older. Real, true ability, ordinarily, is modest and unassuming,—has respect for age and eminence won by long years of study and labor.

I am impressed in the examination of this case with the truthfulness of the plaintiff's claim that he regarded this catalogue all along as his own work; that he never consented to surrender it to the defendant; that he intended to give defendant full credit for all he did upon or with reference to it, but that the defendant, as he became familiar with the work, and learned how to manage its details, conceived the design of appropriating the whole work to himself, and depriving the plaintiff of all credit for, or reputation growing out of, it; that then it was that he threw into the work all his executive ability, and that of his sisters, with a view of overwhelming the plaintiff, and creating the impression and belief in the public mind that it was his own personal work, with which the plaintiff had practically nothing to do. In this view, I must hold the exhibits in question, including Exhibits 4, 5, and 6, were at the time of the commencement of this action the property of the plaintiff, rather than the defendant, and that plaintiff is entitled to recover them in this action. In view of the evidence in the case as to the value of the papers, I cannot fix this value very definitely; but I should say Exhibit 2 was worth $250; Exhibits 4 and 5, each, $500, Exhibit 6, $1,000; and Ex-

hibit 8, $10,—making in all $2,260. Damages for detention will be fixed at the amount of interest on above values from time of commencement of action. Formal decision will be prepared by plaintiff's counsel, and be submitted to defendant's counsel for approval as to form, and then to me for signature. Requests will be passed upon at the time of signing decision.