AUGUSTUS M. SAUNDERS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 10526. Promulgated March 26, 1928.

*Maynard Teall, Esq.*, for the petitioner.
*Alva C. Baird, Esq.*, for the respondent.

OPINION.

MILLIKEN: Petitioner insists that prior to March 1, 1913, he was the owner of an unconditional, assignable, vested right to receive the purchase price for the property sold and transferred by him to the National Tube Co. on May 6, 1911; that his right was not the less unconditional or vested because it was unliquidated in amount; that this right was in 1911 capital; and that the realization on this right in 1920 through payment did not result in taxable income in the latter

year. As an alternative to these contentions, he urges that if he did not possess an enforceable right in 1911, then the payment to him in 1920 was in the nature of a gift and therefore not taxable.

Before these contentions can be discussed or decided, it is necessary to ascertain what was the contract or understanding between petitioner and the National Tube Co. under which the assignment of May 6, 1911, was made. Petitioner produced at the hearing the form of contract set forth in the findings of fact and testified as follows:

Q. I show you Exhibit 1, Mr. Saunders, and ask you what that is; if you recognize that form of paper?
A. Yes, I recognize it.
Q. What is it?
A. It is a contract that the National Tube Company drew up, I think in 1894.
Q. Did you ever execute a contract in that form?
A. To the best of my recollection, I did.
Q. Do you have the original of that contract?
A. No, I have not been able to find it.
Q. What effort have you made to find it, if any?
A. I looked for it, and the Company looked for it in their files.
Q. If you signed such a contract, when did you sign it?
A. It would have been in 1894—I think that is the date on there.
Q. And it would be in this form?
A. Yes.

Again he testified:

Q. Mr. Saunders, in the general form of contract which you have testified the Company used and which has been introduced as Exhibit No. 1, it is provided that when an application is made for a patent that the sum of $200 should be paid. Did you get that $200 at the time the application was made?
A. No, sir.
Q. You still have something coming from the Company?
A. That is included in the $25,000.

Counsel for petitioner in his brief, filed in this proceeding, after referring to the above testimony, makes the following suggestion: " The printed form was signed in 1894, several years before the United States Steel Corporation was organized, and probably, therefore, the Rules of which Saunders had full notice, superseded it." It is significant that the president of the National Tube Co. in his letter to petitioner dated September 1, 1920, stated that the patent committee, which was a committee of the United States Steel Corporation, had recommended the payment to petitioner of $25,000, and that he was in receipt of a communication from the United States Steel Corporation recommending the payment. It thus appears that the amount of compensation was not determined by the general officers of the National Tube Co. having charge of the manufacturing department, as provided in the form of contract, but by the committee created by the parent company, and that the assignment of May 6,

1911, was made under the rules of the United States Steel Corporation and not under the alleged contract.

Reversing the order in which the questions are stated above, we will discuss first the issue whether the payment made in 1920 was in the nature of a gift. At the outset, it is pertinent to state that, under the facts of this case, whatever may have been the rights of the National Tube Co. in the nature of a license to use the patent, it had no right to the patent itself. See *Hapgood* v. *Hewitt*, 119 U. S. 226; *Gill* v. *United States*, 160 U. S. 426, 30 Cyc. 880.

Before it can be held that the payment of $25,000 was a gift by the National Tube Co. to petitioner, it must first be found that petitioner made a gift to the company of his invention and his inchoate rights to the patent, since, if he made the assignment with the expectation of receiving compensation, all elements of gift disappear. The contract of assignment negatives the idea of gift. It is therein recited that the assignment was made in consideration of $1 and other valuable considerations. The record shows that it was the policy not only of the National Tube Co., but also of the United States Steel Corporation, to encourage their employees to make inventions and assign their rights to the corporation upon the expectation of receiving compensation therefor. It is aptly said in *Steele County* v. *Erskine* (C. C. A.), 98 Fed. 215: "To discharge an obligation which rests upon full value received is neither a 'gift' nor a 'donation.'" Under all the facts of this case, we are of the opinion that no gift was intended or made either by petitioner of his rights to the company or by the company when it made payment.

Here we are met with the contention that as early as May, 1911, petitioner had a vested right to receive payment for his invention and his rights to a patent; that this right was in nowise contingent; and that the payment made in 1920 was but a liquidation of a claim which had vested prior to March 1, 1913. The solution of this question depends largely upon what was the subject matter assigned by the contract of May 1911, and upon what were the conditions which had to be fulfilled, not only to determine what amount petitioner should receive but also whether he would receive anything whatever.

Prior to May 6, 1911, petitioner had designed and constructed a pipe drawing apparatus. On May 6, 1911, he applied for letters patent on the apparatus. On the same date he assigned to the National Tube Co. all his rights to such apparatus and in, to and under his application for letters patent. Because of certain interferences and litigation, the patent was not issued until October 15, 1918. Until the patent was issued, neither petitioner nor his assignee had any right to the exclusive use of the invention which

could be protected by injunction. *Rees* v. *Lombard* (C. C. A.), 21 Fed. (2d) 276; *Marsh* v. *Nichols, Shepard & Co.*, 128 U. S. 605. In *Durham* v. *Seymour*, 161 U. S. 235, the rights of an applicant for a patent and of his assignee are thus defined:

It is true that "the discoverer of a new and useful improvement is vested by law with an inchoate right to its exclusive use, which he may perfect and make absolute by proceeding in the manner which the law requires"; and that an assignment may, under circumstances, be made which will operate upon the perfect legal title which the discoverer had a lawful right to obtain, as well as upon the imperfect and inchoate interest which he may actually possess. *Gaylor* v. *Wilder*, 10 How. 477, 493.

So rights growing out of an invention may be sold, whether the sale in any case carries with it anything of value or not. *Hammond* v. *Mason & Hamlin Organ Co.*, 92 U. S. 724,, 728. But "until the patent is issued there is no property right in it, that is, no such right as the inventor can enforce. At all events there is no power over its use, which is one of the elements of the right of property in anything capable of ownership." *Marsh* v. *Nichols*, 128 U. S. 605, 612; *Brown* v. *Duchesne*, 19 How. 183.

Turning to the rules promulgated by the United States Steel Corporation, we find that the controlling thought which ran through them is the avoidance of infringements of patents held by others and the acquisition of inventions which were susceptible of being patented. In several places, the subsidiaries are warned of the danger to which they would be subject if they permitted their employees to develop new inventions and sell their patent rights or grant licenses to competing companies. The rules relate to nothing but patents, and center all such matters in a patent committee and an expert legal advisor. Under the circumstances presented by this record, it is inconceivable that any subsidiary of the United States Steel Corporation would purchase and pay for an invention irrespective of whether a patent could be secured.

Sections 6 and 7 of article III of the rules provide:

SECTION 6. If the person having the negotiations in charge is of opinion that the invention will be of importance to other subsidiary companies, but that it is not important to acquire a monopoly and to exclude competing companies from its use, then he should secure a license for use by all subsidiary companies. But in such case, in addition to paying the cost of taking out a patent, it should be understood that the company will pay to the inventor a sum of money, the amount of which, of course, cannot be suggested even in a general way, but can only be fixed by the circumstances of the case.

SECTION 7. If the person having the negotiations in charge is of the opinion that the invention will be of importance to other subsidiary companies, and that it is desirable that competing companies should be excluded from the use of the inventions, then he should secure an assignment of the entire ownership in the patent. In this case likewise it should be understood that a sum of money will be paid to the inventor, the amount depending upon the circumstances.

It is to be noted that where a license only is to be secured, it is provided that the amount to be paid therefor is not even to be sug-

gested in a general way but is only to be fixed by the circumstances of the case. Section 7 is tied up with section 6 by the use of the word "likewise." In both sections the amount to be paid depends upon the "circumstances." Both these sections relate not to the purchase of inventions but to the purchase of patents or patent rights and indicate that if no patent is secured, nothing is to be paid. This conclusion is borne out not only by the rules but by the facts as they appear in the record. Petitioner has assigned to his company about twenty applications for patents, all of which have been granted, and it does nöt appear that he was paid on any assignment until a patent was secured. For several he had not been paid at the date of the hearing. In this particular case, no sooner had the application for the patent been filed than interferences developed and litigation ensued. Over seven years elapsed between the filing of the application and the granting of the patent. During all this time the petitioner and his assignee possessed only an inchoate right to a patent which might or might not develop into an absolute right. During all this time their rights were contingent on, among other things, whether someone else had or had not anticipated the invention. This is just what Neckerman alleged both before the Commissioner of Patents and in the Court of Appeals of the District of Columbia. It is most significant that no payment was made until all these obstacles had been removed.

These views are confirmed by the statements of the secretary of the National Tube Co. in his verified letter to petitioner dated October 23, 1925, where it is stated that the reason for the long interval (9 years) between the date of the assignment and "the date of the payment for this patent was on account of the delay in the issuance of the patent and the litigation in which it was involved both before and after issuance." Here it is distinctly stated that the payment was made for the patent and that the payment was delayed because the issuance of the patent was delayed and because of litigation. Petitioner in his verified letter to the Deputy Commissioner of Internal Revenue wrote:

In reference to the item of $25,000.00 paid me by National Tube Company, I must protest the inclusion of this item in my 1920 income subject to tax. This sum was paid me as the purchase price of a patentable idea conceived by me in 1910 and for which I made patent application in the year 1911, the application being assigned to National Tube Company on May 6, 1911, with the understanding that payment was to be made when patent was issued. Litigation delayed the issuance of the Patent until Oct. 15, 1918, and subsequent litigation was not finally disposed of until about a year later.

When confronted with these letters, petitioner testified that there was no understanding either oral or written between him and the National Tube Co. as to whether he was to be paid for the patent

or as to the amount of payment, other than as provided in the form of contract or in the rules. Giving full credit to petitioner who, when on the witness stand, made a full and fair disclosure of all the facts as he recalled them, we must remember that he testified 16 years after he executed the assignment. We are of opinion that the statements made in petitioner's verified letter of October 6, 1925, have greater evidential value than his oral testimony at the hearing, especially since those statements are in harmony with the verified letter of the secretary of the National Tube Co. of October 3, 1925. Taking into consideration all the facts as shown by the record, we are of opinion the amount of petitioner's compensation was largely, if not wholly, dependent on the acquisition of a patent.

While nothing remained for petitioner to do after March 1, 1913, except to furnish such aid in the prosecution of the claims for patents as might be required, his right to payment was determined by contingencies which were not resolved until after that date. In this respect, this proceeding is similar to *Edwards* v. *Keith* (C. C. A.), 231 Fed. 110, and *Woods* v. *Lewellyn* (C. C. A.), 252 Fed. 106. In both these cases the court sustained the right of the Government to tax as income amounts paid to insurance agents under contracts which give them commissions on renewal premiums. In each case the taxpayer had prior to March 1, 1913, done all that was required to earn the commissions. Each court based its decision on the ground that the right of the taxpayer on March 1, 1913, was contingent upon the payment of the premiums by the various policy holders.

At this point we are met by the further contention of petitioner that conceding that events which occurred subsequent to March 1, 1913, may have served to increase the amount of his compensation, yet his right thereto was vested prior to that date and that increase in value is not taxable income. This contention overlooks the fact that what petitioner possessed in 1913 was an unliquidated conditional claim and that he had realized on this claim in 1920. Of course, so long as he held only the claim mere increase in its value did not result in taxable income but when he realized on it and received the money, he was taxable on all value that accrued subsequent to March 1, 1913. Petitioner relies on *Platt* v. *Bowers*, 13 Fed. (2d) 951, and *Hewes* v. *Heiner*, 24 Fed. (2d) 748. The facts in *Platt* v. *Bowers* were that an insurance agent in the year 1909 surrendered his right to receive commissions on renewal premiums in consideration of the payment of $10,000 a year for 15 years. The court held that the taxpayer was not taxable on so much of said payments received after March 1, 1913, as represented capital on that date, but concluded its opinion as follows:

It is true that the obligation which the plaintiff possessed on March 1, 1913, was of a value less than its face amount, because the payments were deferred.

It may be inferred from the fact that the payments have been made that the company was entirely responsible financially. The amount of the discount which may be regarded as income is therefore susceptible of mathematical calculation at the legal interest rate. Counsel are requested to agree, without prejudice to their clients' rights, upon a computation of the amount recoverable in accordance with this opinion. *

Not only did the court hold that the amount of discount was income, but suggested that the responsibility of the obligor might, in a proper case, be taken into consideration in determining the March 1, 1913, value. See also *Ruth Iron Co.,* 4 B. T. A. 1151, affirmed by Circuit Court of Appeals, Seventh Circuit, 26 Fed. (2d) 30.

In *Hewes* v. *Heiner, supra,* the facts were the taxpayer had purchased in 1896 the fee simple title to a lot of ground in Erie, Pa. The owners of adjoining property claimed rights of way over the ground by reason of user for upwards of twenty-one years. Litigation ensued in which the taxpayer subsequent to March 1, 1913, succeeded in defeating all such claims. In 1918 he sold the property. The question before the court was whether the value of the ground on March 1, 1913, or the value of plaintiff's claim to the ground on said date was the proper basis of computing gain arising from the sale. The court held that the value of the ground on said date was the proper basis and, among other things, said:

In truth, the plaintiff owned the property and was entitled to exclusive possession of the same, before as well as after March 1, 1913. The value of that property so held and owned was the true basis of the tax, not the invalid claim of some third party in reference to the land. It would appear to be beyond the power of any one to establish the value for the adverse claims asserted by adjoining owners. As soon as the case could be reached for adjudication the courts determined that such claims had no value. It certainly could not be the law that one man may change the basis of his neighbor's tax by wrongfully asserting an unfounded claim against his property.

It is at once apparent that the *Hewes* case differs in most important particulars from this proceeding. There Hewes was the owner in fee simple of the ground on March 1, 1913. He could and did demand the protection of the courts. These courts decided that the claims of the adjoining lot owners were absolutely unfounded and that Hewes' title was good from the date of his purchase. Here neither petitioner nor his assignee had on March 1, 1913, the exclusive right to the use of the invention which they could enforce. It was this exclusive right which they sought to acquire. They had only an inchoate right to the patent. The patent, when granted, did not relate back to the date of application but was effective only from and after the date of issuance. The value of the patent in 1918, when granted, was quite different from the value of the inchoate right to apply for a patent. Petitioner had on March 1, 1913, the right to be

compensated for his invention, but this right was contingent either wholly or in part on whether a patent could thereafter be secured. We are of opinion that if no patent had been secured, no payment would have been made. Conceding, however, that in the absence of a patent, something might have been paid, it is apparent that such an amount would have been much less than what was in fact paid. If so, petitioner has not proved nor attempted to prove what such amount might have been—he has not attempted to prove value as of March 1, 1913. Whether, therefore, petitioner's right to compensation was partially contingent or wholly contingent, the action of respondent must be approved. Cf. *Jackson* v. *Smietanka* (C. C. A.), 272 Fed. 970; *Forbes* v. *Nichols*, decided by the United States District Court for the District of Massachusetts, July 27, 1927, unreported; *Appeal of E. A. Armstrong*, 1 B. T. A. 296; and *Appeal of Henry S. Kline*, 3 B. T. A. 1138.

Reviewed by the Board.

*Judgment will be entered for the respondent.*