# HAPGOOD *v.* HEWITT.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF INDIANA.

Argued November 10, 11, 1886. — Decided November 29, 1886.

In a suit in equity by the trustees of a dissolved Missouri corporation to compel an employé of the corporation to convey to the plaintiffs the title to letters-patent obtained by him for an invention made while he was in their employ, it not appearing, from the facts set forth in the bill, that there was any agreement between the employé and the corporation, that

it was to have the title to the invention, or to any patent he might obtain for it, it was held, on demurrer, that the bill could not be sustained.

Although the dissolved corporation assigned its right in the premises to an Illinois corporation organized by the stockholders of the former, whatever implied license the former had to use the invention was confined to it, and was not assignable.

The employé could bring no suit for infringement against the Missouri corporation, for it was dissolved; nor any suit in equity against its trustees for an infringement, for they were not alleged to be using the invention; and a suit at law against the trustees, or the stockholders, of the Missouri corporation, for infringement by it, could not be enjoined, because the theory of the bill was that there was a perfect defence to such a suit.

The case is stated in the opinion of the court.

*Mr. Everett W. Pattison,* (*Mr. Newton Crane* was with him on the brief,) for appellants, cited: *Hiern* v. *Mill,* 13 Ves. 114; *Powell* v. *Spaulding,* 3 Green, (Iowa,) 443; *Course* v. *Stead,* 4 Dall. 22; *McClurg* v. *Kingsland,* 1 How. 202; *Continental Windmill Co.* v. *Empire Windmill Co.,* 8 Blatchford, 295; *Gower* v. *Andrew,* 59 Cal. 119; *Grumley* v. *Webb,* 44 Missouri, 444; *Brooks* v. *Byam,* 2 Story, 525; *Wilson* v. *Stolly,* 5 McLean, 1; *Goodyear* v. *Congress Rubber Co.,* 3 Blatchford, 449; *Goff* v. *Oberteuffer,* 3 Phil. 71; *Hartford* v. *Chipman,* 21 Conn. 488; *Barber* v. *Barber,* 21 How. 582; *Whiting* v. *Graves,* 3 Ban. & A. 222; *Wilkens* v. *Spafford,* Ib. 274.

*Mr. E. E. Wood* and *Mr. Edward Boyd,* for appellee, submitted on their brief, citing: *McClurg* v. *Kingsland,* 1 How. 202; *Oliver* v. *Rumford Chemical Works,* 109 U. S. 75; *Troy Iron and Nail Factory* v. *Corning,* 14 How. 193; *Lightner* v. *Boston & Albany Railroad,* 1 Lowell, 338.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

This is a suit in equity brought in the Circuit Court of the United States for the District of Indiana, by Charles H. Hapgood, James H. Hesse, and John Packer, trustees of Hapgood & Company, a dissolved Missouri corporation, and the Hapgood Plough Company, an Illinois corporation, against Horace L. Hewitt. The main object of the suit is to obtain from

Hewitt the transfer of letters-patent granted to him for an invention. The defendant interposed a general demurrer to the bill, for want of equity.. The Circuit Court sustained the demurrer and dismissed the bill, 11 Bissell, 184, and the trustees have appealed to this court.

The material allegations of the bill are as follows: The Missouri corporation was in existence from before August 1st, 1873, to January 1st, 1880, when it was dissolved. At the latter date the three trustees constituted its board of directors, and Hapgood was president. By virtue of the laws of Missouri, Hapgood and the other two persons became trustees of the corporation, with power to settle its affairs and recover the debts and property belonging to it. Hapgood was the president of the corporation during its entire existence, and had the control and management of its business. All the officers and employés were under his direction. He had power to hire and discharge all agents and employés of every grade, to determine the classes and kinds of goods that should be manufactured, and the general way in which the business should be conducted. The corporation employed a large number of manual laborers, and various employés of higher grades, among them a superintendent, a secretary, a foreman, and a travelling salesman, all of whom had charge of different departments, but were under the control and direction of the president as chief executive officer. The duties of the superintendent were to have general charge of the manufacturing department, subject to the discretion of the president, and to devise and get up such new devices, arrangements, and improvements in the ploughs manufactured as should adapt them to the market, and as should be needed from time to time to suit the wants of customers. Shortly before August 1st, 1873, Hewitt represented to the corporation that he was a man of large experience in mechanical pursuits; that he had been for several years immediately preceding engaged with Avery & Sons, plough manufacturers in Louisville, and had been since 1868 familiar with the manufacturing of ploughs and agricultural implements; that he had been instrumental in devising and getting up the best ploughs manufactured by Avery & Sons;

that the most valuable improvements in the ploughs manufactured by them had been devised by him and adopted at his suggestion and instigation; that since 1869 he had given his undivided attention to the manufacture of ploughs, and understood thoroughly the different kinds of ploughs in the market, and the classes of ploughs needed for the trade; and that he could and would give to any manufacturer who should secure his services the benefit of his experience in devising and making improvements in the ploughs manufactured. In consequence of these representations and relying upon them, the corporation employed Hewitt to devote his time and services to getting up, improving, and perfecting ploughs and other goods, and to introducing the same; and, that he might be more fully identified with the corporation, he purchased one share of its stock, and was elected vice-president. At some time in 1874, Hewitt increased his interest in the company by purchasing one half of the shares owned by the president. As a part of the same transaction, it was agreed between Hewitt and the corporation, that, from that date, Hewitt should fill the position of superintendent of the manufacturing department, and as such, not only exercise a general supervision over that department, subject to the president, but also devote his time and services to devising improvements in, and getting up and perfecting, ploughs adapted to the general trade of the corporation. He accepted the position and held it until the fall of 1877, when his connection with the corporation ceased. He agreed, in such new position, to use his best efforts, and devote his knowledge and skill, in devising and making improvements in the ploughs manufactured by the corporation, and in getting up and perfecting ploughs and other agricultural implements adapted to its trade. In view of the expected value of his services in this latter direction, the corporation was induced to pay him, and did pay him, a salary of $3000 a year. It was manufacturing a plough known as a sulky or riding plough, so arranged that the plough was carried on a frame supported by wheels, and that the driver of the horses rode on the frame. Down to the year 1876, this sulky plough had a wooden frame. During that year, it was thought desirable by the officers of

the corporation that a change should be made by the substitu-tion of an iron frame for the wooden one. The officers, in-cluding Hewitt, had frequent conversations during the winter of 1875–6 with reference to such change. In those conversa-tions, and in personal conversations with Hewitt, the presi-dent stated that he was anxious to retain in the iron sulky all the essential features of the wooden sulky, so far as was consis-tent with the use of an iron frame, and suggested other features which he thought it important to adopt in the new plough, and Black, a salesman, urged the importance of having an iron axle of an arched form. As the result of these conversations and deliberations, Hewitt was, early in the summer of 1876, directed by the president to proceed at once to devise and build an iron sulky plough according to the suggestions so made, that is, that he should retain in the new plough all the valuable features of the wooden sulky, which the corporation had been manufacturing, should construct the plough of wrought and malleable iron, should adopt the other features suggested by the president and the arch suggested by Black, and should add such additional features as might seem advantageous to him, Hewitt. He was directed to proceed with the work without delay, so that the corporation might be ready to man-ufacture the new plough for the season of 1877. In accord-ance with those directions, Hewitt devised and constructed a sulky plough of wrought and malleable iron, and, after some delays, about the 1st of April, 1877, produced a plough satis-factory to the president. During all the time that he was en-gaged in devising and constructing the new plough, he was in the employ of the corporation, and drawing a salary of $3000 a year. The time during which he was so engaged was the regular working hours in the factory. The men who did the manual labor on the new plough were all employés of, and paid by, the corporation; and all the materials used in its construc-tion were bought and paid for by the corporation. The work, as it progressed, was under the general superintendence of Hewitt, but the work in the respective departments was also under the special superintendence of the respective foremen of those departments, who were also paid by the corporation.

During the whole time of the construction of the plough, it was understood by all the parties engaged therein, and by those at whose instance its construction was commenced, that it was being devised and constructed for the use and benefit of the corporation, and as a model for the future construction of sulky ploughs by it. After the plough was completed, and had been accepted by the president as satisfactory. the latter directed Hewitt to go to Chicago and have the necessary malleable castings made for the construction of ploughs after the model. Hewitt did so, obtaining at Chicago castings, moulds, and other things necessary for the future building of ploughs after the model. During the time so spent, he was drawing his regular salary; and all his expenses, as well as the price of the models, castings, and other things obtained by him, were paid by the corporation. During the time Hewitt remained in its employ, he never made any claim of property in any of the devices and improvements made or suggested by him in the new plough, and never stated or claimed that he was entitled to a patent on any of said improvements, or that he had any rights adverse to the corporation in any of said improvements or devices, and never, during the term of his employment, asserted any right to a patent in his own name for such improvements or devices, or any of them. After his connection with the corporation had ceased, and after he had made an arrangement with the president, whereby the latter bought back all his (Hewitt's) stock in the corporation, and after the corporation had been for many months, with the knowledge of Hewitt, engaged in the manufacture of such ploughs, Hewitt, on January 14th, 1878, applied for a patent on the improvements in the plough, and, on the 26th of March, 1878, a patent was granted to him, covering certain parts of the plough, being devices which had been theretofore used by the corporation, with his knowledge and consent. After this patent was issued, he, for the first time, claimed, as he has since claimed, that he had and has an exclusive right to manufacture such parts of the plough as are covered by the patent, and has threatened to enforce his rights under the patent as against the corporation, its representatives, successors, and assigns, and to hold them liable in damages for any infringement of the same.

The bill also alleges that, in devising and constructing the plough, Hewitt was only performing his duty as an employé of the corporation; and carrying out his contract with it; that he was doing only what he was hired and paid to do; that the result of his labors belonged to the corporation; that it became, in equity and good conscience, the true and rightful owner of the right to manufacture the plough; that, if there is any part thereof which is patentable, the patent belonged to the corporation as equitable assignee of Hewitt; and that he was and is bound, in equity and good conscience, to make an assignment of the patent to the corporation or to its trustees.

The bill also alleges, that, upon the dissolution of the corporation of Hapgood & Company, the stockholders thereof organized another corporation, under the laws of Illinois, under the name of the Hapgood Plough Company, one of the plaintiffs; that the Hapgood Plough Company succeeded to the business of the prior corporation, and became by assignment from it the owner of all the latter's assets, whether legal or equitable, including the rights in the patent issued to Hewitt, which such prior corporation had or was entitled to, whether legal or equitable, and its right to manufacture a sulky plough in accordance with the model plough made by Hewitt, including all the devices covered or claimed to be covered by the patent; and that all the rights in the premises which the prior corporation had have been fully transferred to and vested in the new corporation. The bill then alleges a refusal by Hewitt to assign the patent to the plaintiffs, and that he claims to hold it adversely to them.

The prayer of the bill is for a decree directing the defendant to make an assignment of the patent, or of such interest as he may have therein, and of all his rights thereunder, to the Hapgood Plough Company, assignee of Hapgood & Company, or to the trustees of Hapgood & Company, in trust for the Hapgood Plough Company, vesting the title to the patent, or to the defendant's rights thereunder, in the Hapgood Plough Company, or in said trustees in trust for that corporation, and that he be enjoined and restrained from maintaining any action at law or in equity for any infringement of the patent

by Hapgood .& Company, or for the use by. that corporation of any of the devices or improvements covered by the patent. ·

The decision· of the Circuit Court, 11 Bissell, 184, was placed on the ground (1) that Hewitt was not expressly required, by his contract, to exercise his inventive faculties for the benefit of his employer, and there was nothing in the bill from which it could be fairly inferred that he was required or expected to do so; (2) that, whatever right the employer had to the invention by the terms of Hewitt's contract of employment, was a naked license to make and sell the patented improvement as a part of its business, which right, if it existed, was a mere personal one, and not transferable, and was extinguished with the dissolution of the corporation.

We are of opinion that the views taken of the case by the Circuit Court were correct. There is nothing set forth in the bill, as to any agreement between the corporation and Hewitt, that the former was to have the title to his inventions or to any patent that he might obtain for them. The utmost that can be made out of the allegations is, that the corporation was to have a license or right to use the inventions in making ploughs. It is not averred that anything passed between the parties as to a patent. We are not referred to any case which sustains the view, that, on such facts as are alleged in the bill, the title to the invention or to a patent for it passed. In *McClurg* v. *Kingsland*, 1 How. 202, the facts were in some respects like those in the present case, but the decision only went to the point that the facts justified the presumption of a license to the employer to use the invention, as a defence by him to a suit for the infringement of the patent taken out by the employé.

The Circuit Court cases referred to do not support the plaintiffs' suit. In *Continental Windmill Co.* v. *Empire Windmill Co.*, 8 Blatchford, 295, there was an agreement that the employé should receive $500 for any patentable improvement he might make. In *Whiting* v. *Graves*, 3 Ban. & A. 222, it was held that an employment to invent machinery for use in a particular factory, would operate as a license to the employer to use the machinery invented, but would not confer

on the employer any legal title to the invention or to a patent for it. In *Wilkens* v. *Spafford*, 3 Ban. & A. 274, the contract was that the employer should have the exclusive benefit of the inventive faculties of the employé, and of such inventions as he should make during the term of service.

Whatever license resulted to the Missouri corporation, from the facts of the case, to use the invention, was one confined to that corporation, and not assignable by it. *Troy Iron & Nail Factory* v. *Corning*, 14 How. 193, 216; *Oliver* v. *Rumford Chemical Works*, 109 U. S. 75, 82. The Missouri corporation was dissolved. Its stockholders organized a new corporation under the laws of Illinois, which may naturally have succeeded to the business of the prior corporation, but the express averment of the bill is, that it took by assignment the rights it claims in this suit. Those rights, so far as any title to the invention or patent is concerned, never existed in the assignor. As to any implied license to the assignor, it could not pass to the assignee.

As to so much of the prayer of the bill as asks that Hewitt be enjoined from maintaining any action at law or in equity for any alleged infringement of the patent by the prior corporation, or for its use of any of the devices or improvements covered by the patent, which is all there is left of the prayer of the bill, any suit to be brought would not be a suit against the corporation, for it is dissolved; and could not be a suit in equity against its trustees, for they are not alleged to be using the invention. It could only be a suit at law against the trustees or the stockholders of the old corporation, for infringement by it while it existed. The theory of the bill is, that there is a perfect defence to such a suit. In such a case a court of equity, certainly a Circuit Court of the United States, will not interfere to enjoin even a pending suit at law, much less the bringing of one in the future. *Grand Chute* v. *Winegar*, 15 Wall. 373; 1 High on Injunctions, §§ 89 to 93, and cases there cited.

*Decree affirmed.*