## THE CONNELLY MANUFACTURING COMPANY

*v.*

## CYRA B. WATTLES

1. Where one person agrees to invent for another, or to exercise his invent-ive ability for the benefit of another, the inventions made and patents pro-cured, during the term of service covered by the contract, belong in equity to the employer and not to the employe.

2. When the facts, creating the equity on which the complainant's right to an injunction rests, are denied, under oath, in such manner as to show that they are not true, or as leaves their truth in serious doubt, an injunction must be denied, unless it clearly appears that to put the restraint on the defendant, which is asked, will do him no serious harm, while a refusal to enjoin the defendant will deprive the complainant of all relief should he finally succeed in his cause, or subject him to some other peculiar hardship.

On application for an injunction. Heard on bill and affidavits on the part of the complainant, and affidavits on the part of the defendant.

*Mr. Anthony Q. Keasbey,* for the complainant.

*Mr. Foster M. Voorhees,* for the defendant.

VAN FLEET, V. C.

The question presented for decision in this case is, whether or not the complainant is entitled to an injunction restraining the defendant from making sale or any other disposition of two let-ters patent granted to him by the government of the United States. The complainant claims that the patents in question are its property in equity, and that, although they were issued to the defendant, still, in point of equity, he simply holds their legal title in trust for it, and that, therefore, he should be enjoined from making any use of them, for his own benefit, until this suit shall have been finally decided. It is not denied or disputed that the patents were issued for inventions which the defendant had made or discovered, but the complainant says that the patents are its property, because when the inventions were made

Connelly Manuf. Co. v. Wattles.

which the patents cover, as well as when the letters patent were issued, the defendant was in its employ under a contract, by which he had bound himself to devote his whole time and skill to its service, and to exercise his inventive faculties for its benefit in improving and perfecting a gas motor for street car propulsion, belonging to it, and to give it all the results thereof. It is thus seen that the contract upon which the complainant rests its right to relief is a contract for the special service of making inventions for the purpose of improving and perfecting a machine belonging to the complainant. There can be no doubt that such a contract is clearly within the contracting capacity of any two persons possessing the requisite capacity to make other valid agreements. A man may sell the conceptions and productions of his mind. He has the same right to agree to work for another with his brains that he has to agree to labor for him with his hands. In employments where skill or art is required, the most valuable service which, as a general rule, the employe renders to his employer is by the exercise of his mental faculties. The doctrine is settled, that where one person agrees to invent for another, or to exercise his inventive ability for the benefit of another, the inventions made and patents procured during the time of service covered by the contract belong in equity to the employer and not to the employe. The adjudications on this subject are uniform, so far as I have examined them. *Wilkens* v. *Spofford, 3 Bann. & A. 274; Burr* v. *De La Vergne, 102 N. Y. 415; Annin* v. *Wren, 44 Hun 352; Binney* v. *Annan, 107 Mass. 94; Hapgood* v. *Hewitt, 119 U. S. 226, 233.* The decisive question of the case, then, at this time, is, does it satisfactorily appear, on full consideration of all the facts now before the court, that, at the time the inventions were made which are covered by the patents in question, such a contract as that alleged existed between the complainant and defendant?

The circumstances which led the complainant to make the contract are described in the bill as follows: prior to the time when the contract was made the complainant had been engaged in trying to construct a gas motor for the propulsion of street cars; it had so far completed its motor that it had been used, for

about eight months, on a street railway in the city of Elizabeth;
such use had demonstrated that the principles applied were cor-
rect, but that "certain changes in the adaptation of the parts,
and some improvements in mechanical details," were necessary in
order to make the motor a complete success; to make the changes
and improvements required, the managers of the complainant be-
lieved it was necessary that the services of some person with good
mechanical skill and experience should be engaged; the defend-
ant was recommended as a fit person to perform such service, and
shortly thereafter, the complainant says, the contract in question
was made. In negotiating the contract Mr. Thomas E. Con-
nelly, vice-president of the complainant, acted for the complain-
ant. He is the only person who has made an affidavit, on the
part of the complainant, defining the terms of the contract, or
describing what was said and done during the negotiations. He
says, in his affidavit, in stating the terms of the contract, that

"No written agreement was drawn, but it was distinctly understood that he
[the defendant] was to give us the benefit of his whole time, skill, knowledge
and ability in improving and perfecting our motor, and it was our distinct un-
derstanding that, as the consideration for giving him a larger salary than he
demanded, we should secure, with respect to our motor, all the fruits of his
skill and inventive ability as applied to it under our supervision; that the
sole work in which he was to be engaged was the perfection of our motor, in
the development of improvements therein and the elimination of the faults
discovered in former practice;   *   *   *   it was understood that the defendant
should give his undivided attention and time to that single duty."

Mr. Connelly further says that he and his brother, John S.
Connelly, after such contract of employment had been made,
pointed out to the defendant faults or defects in the complainant's
motor which experiments had disclosed, and also confided to him
all they knew about the motor, and their designs respecting the
same, for the purpose of placing him in a position where he could
use his skill and inventive ability, in perfecting the motor, to the
best advantage.

That part of Mr. Connelly's affidavit in which he says that
the contract limited the defendant's employment to the special
service of making improvements in the motor and eliminating
faults—that it was understood he should give his undivided at-

tention and time to that single duty—stands contradicted by the nature and character of the services which the defendant rendered to the complainant from the commencement of his employment to its end.   The complainant has annexed a number of affidavits, made by its employes, to its bill, which impute fraudulent mis-conduct to the defendant in the discharge of his duties as super-intendent of the complainant's shop.   These affidavits say that the defendant was the complainant's superintendent; that he had charge of its employes, directed and supervised their work and kept their time.   The bill alleges that he also purchased sup-plies.   The complainant's bill and affidavits show that the de-fendant acted as its superintendent during the whole period of his employment, and that is what the defendant says, on his oath, he was employed to do.   His affidavit contains a positive and ex-plicit denial of every fact upon which the complainant's right to an injunction rests.   He says that when Thomas E. Connelly first called to see him, Connelly told him that he was looking for a superintendent for their shops at Elizabeth, where they were about to commence the manufacture of gas motors to be used on street cars, and that he (the defendant) had been recommended as a suitable person for the position; that, in reply, he said to Con-nelly that he had never heard of such a machine as a gas motor, and that he would not decide whether he would take the position offered until he had visited the shops at Elizabeth; that shortly afterwards he visited the place of business of the Connellys at Elizabeth and agreed to become the superintendent of their shop; that at no time were faults or defects in the motor pointed out to him by the Connellys, nor was anything said indicating that it needed to be changed or improved; on the contrary, he was told that the motor was a complete machine; that it had had faults, but they had been overcome, and that it was then in a state so per-fect that its owners felt justified in entering upon its manufacture and sale.   He further says that, at no time during the negotia-tion of the contract of employment, was anything said respecting his inventive faculties, or the employment thereof, or that he would be required, either as his sole work or as a part of his work, to try to perfect the motor, or to cure its faults, or to make

improvements therein; that nothing was said indicating that the enterprise was regarded as an experimental one; on the contrary, it was expressly stated that the motor was a complete machine, and that the Connellys intended at once to engage in its manufacture in such manner as to turn out as many as possible. The affidavit of the defendant's brother Luther supports and corroborates some of the most material statements contained in the defendant's affidavit. He introduced Thomas E. Connelly to the defendant, and heard Connelly say that he wanted to employ the defendant as the superintendent of their shops at Elizabeth. He went with the defendant to Elizabeth and was present at some of the interviews which resulted in the contract of employment. He says that nothing was said in his presence indicating that the motor was subject to faults, or that it required to be changed or improved in any respect, but it was, on the contrary, spoken of as a complete and demonstrated success, and that he and the defendant were both told that its owners were about to commence to manufacture it in large numbers, and that they wanted to hire the defendant as the superintendent of the shops where such manufacture was to be carried on. He also says that nothing was said to him, nor to the defendant in his hearing, respecting the defendant's inventive ability, nor that the defendant would, in the course of his employment, be required to improve or make changes in the motor, but, on the contrary, his understanding was that the defendant was to be employed solely for the purpose of superintending the manufacture of a machine that was complete and in perfect running order.

This summary of the affidavits in the case shows that every fact which the complainant has put forward as the foundation of the right which it asks to have protected is denied, and that, too, in a manner so thorough and positive as almost to force the mind to believe that the terms of the contract, as set forth in the affidavit of Thomas E. Connelly, is his understanding or construction of them, rather than those which the words used by the persons making the contract would show had been agreed upon. The form of the affidavit, in this respect, is subject to the most serious objection. Unless the contract, according to the meaning

of both parties, gave the complainant a right to the productions of the defendant's inventive faculties, the complainant has no case. Now, the affidavit, it will be observed, in giving the terms of the contract on this point, states what was understood and not what was said. It substitutes what Mr. Connelly now believes was understood by the persons making the contract for what they said. He has given his conclusions as to what the fact is and not the fact itself. So that it is not at all certain that if he had stated what was said, instead of stating what he understood, it would not have been made to appear that the contract, on the point in question, was just precisely what the defendant says it was. With the proofs in this state, the duty of the court, I think, is plain. "The general rule, subject to but few exceptions, is," said the chief-justice in *Citizens' Coach Co.* v. *Camden Horse R. R. Co., 2 Stew. Eq. 299, 306,* "that if the facts constituting the claim of the complainant for the immediate interposition of the court are controverted, under oath, by the defendant, the court will not interfere at the initial stage of the cause." When the facts, creating the equity on which the complainant's right to an injunction rests, are denied under oath, in such manner as to show that they are not true, or as leaves their truth in serious doubt, an injunction must be denied, unless it clearly appears that to put the restraint on the defendant, which is asked, will do him no serious harm, while a refusal to enjoin the defendant will deprive the complainant of all relief should he finally succeed in his cause, or subject him to some other peculiar hardship. No such consequences can flow to the complainant from a denial of its present application. For reasons already stated, it is extremely uncertain whether the complainant has, on the vital point in contest, the least pretence of right against the defendant. If an injunction were granted under such circumstances, the result would be that the defendant would be deprived of the use of certain property belonging to him, by process of law, which, according to the evidence as it now stands, the complainant has no right to whatever. That, it is manifest, should not be done.

The complainant's application must be denied, with costs.