Eustis Manufacturing Co. *v.* Eustis.

THE EUSTIS MANUFACTURING COMPANY and FRANK G. SPRAGUE

*v.*

JOHN P. EUSTIS.

1. Defendant, who owned a patent for a cooking utensil, together with complainants R. and S., organized a company for the manufacture of household furnishings, and assigned the company his patent, each of them subscribing for a certain amount of capital stock. The company became insolvent, and a reorganization was had, under which S. paid out $55,000 in liquidation of debts, relieving defendant and R. of all personal liability therefor, and S. thereby became owner of all the capital stock, one-fourth of which he transferred to defendant. S. testified that defendant agreed to develop as many specialties as possible, and to assign the company all patents therefor. R. testified that, on the first organization, defendant agreed that any patents which he might invent in the line of kitchen utensils should "go to the company." Defendant testified that the original agreement contemplated only the patent originally assigned; that a subsequent patent he assigned the company was assigned only because it was a modification of the first.—*Held* insufficient evidence to warrant a decree compelling defendant to assign the company other patents granted him subsequent to the organization of the company.

2. Where it further appears that the inventions for which the patents in question were granted were developed while defendant was in the company's employ, that the experiments and work in making models were done at the company's factory, and that the patents were taken out by the company's counsel, and at its expense, and that articles were manufactured under the patents, at the company's factory, and put upon the market as the company's goods, without any charge made or demanded for the use of the invention, although so made and sold under the supervision of the patentee while an employe of the company, the company is entitled to an irrevocable, exclusive license for the use of such patents.

On bill, answer, replication and proofs in open court.

*Mr. William P. Douglass* (*Mr. John S. Wise*, of New York, with him), for the complainants.

*Mr. J. Herbert Potts* (*Mr. Peter Condon*, of New York, with him), for the defendant.

GREEN, V. C.

This suit is brought to restrain the defendant from assigning or disposing of certain patents and applications for patents and for the specific performance of an alleged agreement to assign the same, and for other relief.

One of the patents was assigned by the defendant to the complainant company after the commencement of the suit.

The patents involved were issued to the defendant, and the applications for patents in controversy were filed by him while in the employ of the complainant company as its president, under a salary of $2,400 a year.

The company was organized under the laws of New Jersey, the certificate being dated February 7th, 1889, which declares that the objects for which the company was organized were to manufacture and sell specialties in household furnishings, purchase patents and rights thereunder to make such specialties, and to grant to others the license and right to manufacture, use and sell such specialties under such patents, and to purchase lands and erect buildings thereon for the purpose of such manufactures. There were three subscribers to the certificate, namely, John P. Eustis, of New York city, for one hundred and fifty shares; William H. G. Rowe, Boston, seventy-five shares, and Frank G. Sprague, New York city, twenty-five shares. The capital was fixed at $50,000, of the par value of $100; the amount at which the company was to commence business being $25,000.

The complainants' claim is based on the allegation that the defendant's subsequent inventions in the line of their manufacture, as well as the one already issued, were to be the property

Eustis Manufacturing Co. v. Eustis.

or for the use and benefit of the company, in consideration of $15,000 of the capital stock and the defendant's employment as president at the salary named. And complainant Sprague further claims such rights from an agreement under which the company was reorganized, by which defendant was relieved from personal liability on certain indebtedness, and received from him one-quarter of the capital stock of the reorganized company.

The defendant claims that his original undertaking embraced only the existing patent, which he has assigned to the company, and that he assigned the subsequent patent because it was only a modification of the first, and that the reorganization scheme did not contemplate the transfer of any patents or inventions.

The first patent, which was the basis of the agreement, was for a "holder for vessels" used in cooking, and consisted generally of an adjustable metal frame, in which the cooking utensil was placed, with a handle attached to the frame, the whole affording protection to the earthen or other brittle cooking utensil, and a handle by which it could be safely and easily moved. The second patent was a modification of the first.

The case practically resolves itself into the question whether this company was incorporated, or reorganized, with sole reference to this invention, or whether it was to have the benefit of the defendant's (Eustis) other inventions in the line of kitchen utensils. He has secured other patents, which he has not assigned to the company—one, No. 404,694, for a "holder for vessels;" another, No. 450,564, for an egg poacher; and others which, I understand from his testimony, are of the same general character, but the numbers and descriptions of which he did not give when examined as a witness.

The company was incorporated with a capital of $50,000. Fifteen thousand dollars of this was issued to Eustis, and, by the original or some subsequent agreement, was a deferred stock, not entitled to dividend until the cash stock had received ten per cent. Of the cash stock, the complainant Sprague originally took $2,500, and $7,500 more of it was taken by friends of Mr. Eustis and Mr. Rowe, who were the promoters of the company. Mr. Eustis was made president, with a salary of $2,400, and

the company commenced manufacturing in Murray street, New York city.

The result of the operations was such as to render it necessary for some one to advance money to carry them on, and Mr. Sprague became the financial backer of the concern, in the way of loaning it money for the purposes of the business. He discovered, on his return from Europe in the fall of 1890, that the company was practically insolvent—its capital stock sunk, together with $12,000 loaned by himself and others—and he thereupon had an interview with the defendant, Eustis, which resulted in an agreement for the reorganization of the company, under which Sprague paid in $12,500 to take up the outstanding notes of the company to that amount, relieving Eustis and Rowe from personal responsibility which they had incurred by indorsing the notes; subscribed for $10,000 of the stock remaining in the treasury, to give the company a working capital, and took the remaining stock off the hands of the other stockholders. By this arrangement, the whole capital stock of the company was owned by Sprague, who assumed the payment of the company's debts, relieving Eustis and Rowe from any liability therefor.

Sprague says that Eustis agreed, in consideration of this reorganization scheme, which also included the retention of Eustis as president of the company at a salary of $2,400, with the additional promise that if the company's business warranted it, his salary should be increased, and the assignment to him of one-quarter of the capital stock, that he would develop as many new lines of specialties as possible, devote his entire time and services to the company, patent whatever features in the development of the specialties were patentable, would assign anything he had or could get in the matter of patents, and generally would do all that was possible to make a success of the company, which at that time was a failure.

Eustis says, on the other hand, that all he agreed to do with reference to the reorganized company, was to the effect that he was to go ahead and do the best he could, and Sprague was to

back him; that that statement takes in the whole agreement, and that the understanding was about as short as that.

Sprague has, under the agreement, paid some $25,000 in taking up the outstanding indebtedness and stock and for treasury stock, and has loaned the company $30,000 more to carry on the business, and has assigned to Eustis one-quarter of the capital stock of the reorganized company.

The right of the company to an assignment of the patents must rest on an agreement by Eustis to assign them to it. So much of the bill as relates to this relief is for the specific performance of an express contract so to do. The burden of proof is on the complainants to establish the existence of such an agreement. Sprague affirms, Eustis denies, it. It rested, if at all, in parol. Rowe, who with Eustis promoted the incorporation of the company, says that it was proposed, in the first place, to make the cooking utensil, being the holder for vessels with a pot or earthenware vessel inside, in different forms, and then, as they went along, to enlarge the business by making other styles and characters of utensils. That Eustis agreed to contribute to the enterprise, this patent, and any patents which might be worked out by him in this general line of goods, viz., kitchen utensils, and his time and services—that anything Eustis made with the metal trimming and inside utensil "was to go to the company"—while this and other facts raise a strong probability that Sprague's version is the correct one, they cannot be taken as conclusive corroboration, because they are as consistent with the idea that the company was to have an exclusive license to manufacture the goods under the patents.

Probabilities lose their probative force when they apply as aptly to another hypothesis as to the one under consideration. The facts that Sprague has paid out some $55,000, and has assigned one-quarter of the stock to Eustis, are strong evidence that he understood the bargain as he testifies, but they prove only that. Great stress is laid upon an entry in the ledger with reference to the issue of $15,000 of stock to Eustis, but he denies that they were made by him, that he was present when they were made, or that he saw them at the time. Many other circum-

stances are relied on to sustain complainants' claim, but they are also as referable to the theory of a license as to an absolute assignment. The case is a strong illustration of the folly of men allowing the evidence of transactions of such importance to rest in the unreliable memory of two persons.

I do not think the complainants have established, by such a preponderance of evidence that Eustis expressly agreed to assign the patents still in controversy, as to entitle them to a decree to that end.

The question then presents itself whether the complainants are entitled to an irrevocable, exclusive license to use the patents and to relief to that extent, with an injunction to protect them in its enjoyment.

The mere fact that Eustis made these inventions while in the service and pay of the company and in the line of his employment, in the absence of an agreement to that effect, gives the company no right to the ownership of the patents. *Hapgood* v. *Hewitt, 119 U. S. 226; Solomons* v. *United States, 137 U. S. 342.* But a right to an exclusive license to use the patent may, while not given by agreement, be inferred from circumstances.

In *McClurg* v. *Kingsland, 1 How. (U. S.) 202*, Harvey, the inventor, was employed by the defendants, receiving wages from them by the week. While so employed he claimed to have invented the improvement patented, and after several unsuccessful experiments, made a successful one. The experiments were made at defendants' foundry and wholly at their expense, while Harvey was receiving his wages, which were increased on account of the useful result. Harvey continued in their employment some three months, during which time and service he used his invention. He afterwards made an application for a patent, which was granted. He made no demand on the defendants for any compensation for using his improvement, nor gave them any notice not to use it, until some misunderstanding on some other subject. In an action by an assignee of the patent for an infringement, the court held that such facts would fully justify the presumption of a license—a special privilege or grant to the defendants to use the invention; that the facts amounted to

" a consent and allowance of such use," and show such a consideration as would support an express license or grant, or call for the presumption of one to meet the justice of the case by exempting them from liability, having equal effect with a license, and giving the defendants a right to the continued use of the invention.

In *Solomons* v. *United States, supra,* Mr. Justice Brewer says (at *p. 346*): "So, also, when one is in the employ of another in a certain line of work and devises an improved method or instrument for doing that work, and uses the property of his employer, and services of other employes, to develop and put in practical form his invention, and explicitly assents to the use by his employer of such invention, a jury, or a court trying the facts, is warranted in finding that he has so far recognized the obligation of service coming from his employer, and the benefits resulting from his use of the property, and the assistance of his co-employes of his employer, as to have given to such employer an irrevocable license to use such invention."

*Slemmer's Case, 58 Pa. St. 155.* If one employed by another, whilst receiving wages, experiments at the expense of his employer, and constructs an invention, which he permits his employer to use without compensation paid or demanded, and then obtains a patent, a license to the employer to use the patent will be presumed.

The proved facts of this case bring it squarely within the principle of these authorities.

The company was promoted and the stock subscribed for, on the assurance that not only the patent already issued, was to be contributed by Eustis, but that anything he afterwards patented in the line of kitchen utensils, with the feature of the metal trimming and the inside utensil, was, as Mr. Rowe expresses it, " to go to the company." Fifteeen thousand dollars of the original stock was issued to Eustis in payment of his contribution to the company, and that this contemplated not only the existing patent is shown by the recital in the assignment of the second patent. Eustis must have given some such assurance to Sprague to have produced a belief that he would assign all future patents to the

company, so strong that Sprague gave him one-quarter of the capital stock, and has invested some $55,000 in reorganizing and carrying on its business. The improvements or inventions have been developed while Eustis was in the employ of the company, both under the original scheme and that of reorganization, while he was in receipt of a salary, and as to the latter after he had received the stock from Sprague; the experiments and work in making models &c. were done at the company's factory, with its materials and the aid of its employes and machinery. The patents were taken out by the counsel of the company, and the expense attending it, as well as of litigation involving the question of infringement, was borne by the company. It is true that Eustis, when about to break with the company, directed the bookkeeper to transfer the charges to his account, but this was a mere matter of bookkeeping, as he was at the time a debtor of the company, and his account only became good by the accrual of his salary. Articles of the description and of the kind were manufactured at the company's factory, under the supervision of Eustis, before and after obtaining patents, without any charge being made or demanded, and an illustrated price-list book was issued to the trade while he was in charge, containing pictures of the various utensils manufactured, including the designs covered by the patents in question, with descriptive statements and prices, the title page being as follows : " Revised list, September 15th, 1891. Puritan Cookers and other high-grade, popular-price House Furnishing Specialties made by The Eustis Manufacturing Co., 49th Street, Bayonne N. J."

The prayer of the bill is for an injunction, for an assignment of the patents, granted and applied for, and for general relief.

One of the patents has been assigned since the commencement of the suit. Whether the injunction issued is to be made permanent must depend, primarily, on the question whether the complainants have any right in the patents or applications which they are entitled to have thus protected in this suit.

As already stated, they have not shown, by a preponderance of evidence, that they are entitled to a decree for the assignments of the patents. Under a special prayer, relief of the same gen-

eral character, but less extensive, may be granted, or the prayer may be amended if necessary. *The Camden Horse Railroad Co.* v. *The Citizens' Coach Co., 4 Stew. Eq. 525, affirmed 6 Stew. Eq. 267.* Under the prayer for general relief, they may have such relief as is agreeable to the case made by the bill, and sustained by facts and circumstances charged therein, and proved by the evidence, though different from the specific relief prayed for. *Story Eq. Pl. § 42; Hiern* v. *Mill, 13 Ves. 118; Slemmer's Appeal, supra; Force* v. *Dutcher, 3 C. E. Gr. 401, 405.*

The bill not only alleges that Eustis made an express contract to assign the patents in question, but, by paragraph 6, that in consideration of said capital stock of $15,000, his presidency of said company and the payment to him of $2,400 a year as salary, he, the said Eustis, then and there agreed that he would give the said company the benefit of any and all patents for cooking utensils, made by, or issued to him, during the term of his office and employment in said company; by the eighth paragraph, it charges that the defendant is bound, under said agreement, to transfer the patents &c. for the use and benefit of the company; and by the ninth paragraph, that the defendant, being president of the company and manager of its business, in the conduct of the business thereof, proceeded to manufacture under each of the patents.

The testimony of Sprague of the agreement, and that of Rowe, that subsequent improvements were "to go to the company," tend to establish an agreement that the patents in question were to be for the use and benefit of the company, and the authorities before cited establish that the court is warranted in inferring, from the facts before stated, that the company was to have an irrevocable, exclusive license for their use. This does not transfer absolute ownership, as an assignment would, but it is relief of the same general character—less extensive. It will cease on the dissolution of the company and will not pass to an assignee. *Hapgood* v. *Hewitt, supra.*

I will advise a decree that the defendant execute and deliver to the complainant company such license, and that the injunction issued be made permanent.