7 N.J. Super. 345 (1950)
71 A.2d 151
INTERNATIONAL PULVERIZING CORPORATION, PLAINTIFF,
v.
CLEO H. KIDWELL, ET AL., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided January 30, 1950.
*346 Mr. Louis B. Le Duc, for the plaintiff.
*347 Messrs. O'Mara, Conway & Schumann (Mr. Edward J. O'Mara and Mr. Mark N. Donohue, of counsel), for the defendants.
JAYNE, J.S.C.
Where a person expressly or impliedly contracts to devote his mental faculties and exercise his inventive ability for the benefit of his employer, the inventions conceived by him in the course of his employment and as a consequence of its pursuit belong in equity to the employer.
The following adjudications are informative of the doctrine and representative of its pragmatical application. Connelly Mfg. Co. v. Wattles, 49 N.J. Eq. 92, 23 A. 123; Pomeroy Ink Co. v. Pomeroy, 77 N.J. Eq. 293, 78 A. 698; Marcalus Mfg. Co. v. Sullivan, 142 N.J. Eq. 434, 60 A.2d 330; Hoyt v. Corporon, 168 N.E. 94; National Development Co. v. Gray, 55 N.E.2d 783; Solomons v. United States, 137 U.S. 342, 11 S.Ct. 88, 34 L.Ed. 667; Standard Parts Co. v. Peck, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 560; United States v. Dubilier Condenser Corp., 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114, 85 A.L.R. 1488.
The doctrine also envelops a case where the employee during such an engagement to invent, improves, remodels, or rectifies an apparatus or process of his employer as a result of his inventive ideas. In such circumstances the employer is entitled in equity to the beneficial conceptions and productions of the employee. Connelly Mfg. Co. v. Wattles, supra.
It must be conceded that the mere circumstance that an employee developed an invention while in the service of his employer and with the use of the employer's facilities does not, in the absence of an express or implied agreement to that effect, confer any ownership of the invention upon the employer. Hapgood v. Hewitt, 119 U.S. 226, 30 L.Ed. 369, 7 S.Ct. 193; Solomons v. United States, supra; Dalzell v. Duebner Watch Case Co., 149 U.S. 315, 37 L.Ed. 749, 13 S.Ct. 886; Eustis Mfg. Co. v. Eustis, 51 N.J. Eq. 565, 27 A. 439.
From such circumstances the employer may acquire the *348 so-called "shop right," viz., the right to use the invention without paying tribute to the employee or his assigns. Eustis Mfg. Co. v. Eustis, supra; Solomons v. United States, supra; National Development Co. v. Gray, supra; United States v. Dubilier Condenser Corp., supra.
It is indubitable that the law does not prohibit an employee after leaving the service of his employer from freely exercising his talents and giving expression to his revised and reorganized inventive thoughts and ideas in his own independent right. The law regards an invention as the property of the one who conceived, developed and perfected it, and establishes, protects and enforces the inventor's rights in his invention unless he has contracted away those rights. New Jersey Zinc Co. v. Singmaster, 71 F.2d 277, 279.
It is with a recognition of those general principles of law that the consideration of this case is to be pursued.
The relief here sought by the plaintiff is a judgment that the invention embodied in United States patent No. 2,219,011 acquired by the defendant Materials Reduction Company, Inc., is the property in equity of the plaintiff; that Materials Reduction Company, Inc., be compelled to transfer and assign all its right, title, and interest in and to the patent to the plaintiff; that the defendant be enjoined from issuing licenses under the patent, and that the defendants account to the plaintiff for all earnings and profits heretofore derived from licenses and other transactions relating to the patent.
The basic allegation of the plaintiff is that the invention was mentally fabricated by the defendant Nicholas Stephanoff during the period of his employment by the plaintiff and after the termination of his association it was appropriated and exploited by the defendants, who acted with notice of the plaintiff's property rights.
The evidence is voluminous. The exhibits are numerous. The story is a lengthy one, defying brevity in its disclosure. I shall endeavor to summarize only my impressions of its characteristics of primary significance.
On January 25, 1929, American Pulverizing Corporation was organized to promote a patented direct-impact pulverizer *349 which is referred to as the Willoughby Mill. On November 23, 1932, the American created the plaintiff, International Pulverizing Corporation, as its wholly owned subsidiary to serve as its operating unit. In April or May, 1933, one Norwood H. Andrews, an officer of the companies, with the aid perhaps of one Walter Willoughby, is said to have invented a new type of mill which through the trial of the case is designated the Micronizer. A patent covering this mill and process claims was issued on March 3, 1936, and is owned by the plaintiff as assignee.
The Micronizer may be generally described as a squat or horizontal cylindrical chamber which has on the outer circular wall a feed injector and nozzles located peripherally for the inward delivery of air or other gaseous fluid under high pressure. The nozzles are so directed as to supply a forward component of motion to the fluid circulating in the mill. In the center there is a circular outlet for the escaping air and ground material.
It will be informational to explain that the material entering the Micronizer through the injector is entrained by the circulating air which causes the particles of the material to rub against each other and also collide with the circular walls and upper and lower plates of the mill. The centrifugal forces produced by the rapidly circulating stream of air are of such magnitude as to propel the heavy particles of material to the peripheral wall and to retain them there until extremely reduced. As their weight lessens, the centrifugal force ceases to dominate and the ground particles are scoured into suspension and transported inwardly by the vortical stream of air in diminishing circuits to the outlet and discharged as the finished product in particle sizes of a few microns.
On April 1, 1934, the defendant Nicholas K. Stephanoff, a mechanical engineer, came into the employ of the plaintiff. There is persuasive evidence that he was engaged to study the Micronizer, subject it to exploration and experimentation, and to suggest for future patent protection any reformations that would improve its commercial efficiency. He is said to have envisioned an advantageous elaboration of the Micronizer *350 and on June 6, 1935, to have recorded his conception of it in a typewritten memorandum which, it is claimed, was placed in the files of the plaintiff company. This proposed improved structure is identified in these proceedings as the "Stephanoff Memorandum Mill."
That memorandum recommended a mill having "a circle at the periphery, this circle extending rotationally inward into the upper and lower plates, the distance between which will be less than the diameter of the circle. * * * The nozzles should be drilled out along the periphery of this annular circle in such positions as to give the outcoming gases from the nozzles a rotary direction along (around?) the axis of this annular shaped cylindrical ring. At the same time, the resulting motion will be in a forward direction so as to cause a vortex with bottom or top discharge at the center of the mill. * * *"
Stephanoff opined that his conception, if substantialized, would enhance the utility of the mill in that it would increase the time element for grinding and afford a better intermixture of the particles of the material to be reduced.
I must introduce at this point another defendant. On May 18, 1934, the defendant Cleo H. Kidwell, a chemical engineer, was employed by the plaintiff. In November, 1934, he became a director of American Pulverizing Corporation and Director of Research of the plaintiff. He, too, concerned himself on behalf of the plaintiff with the development and improvement of the Micronizer. At that time his relations with the president of the companies were extremely intimate and doubtless confidential. On May 27, 1935, he was made vice-president, and in August following he was elected a director of the plaintiff.
The discord from which this and other controversies have arisen is said to have originated in the summer of 1935. There is evidence that during the absence abroad of Stackhouse and Andrews, the president and vice-president respectively of the companies, in the summer of 1935, Kidwell expressed to Stephanoff his belief that International Pulverizing Corporation was being mismanaged and that Stackhouse was receiving *351 excessive compensation. He then told Stephanoff that he was planning, with the assistance of one Samuel H. Clark, who was a small stockholder of American Pulverizing Corporation and was also through his company, Whittaker, Clark & Daniels, Inc., a licensee of International, to secure control of American's board, and in connection with this plan he further proposed to resign his offices and suggested to Stephanoff that he also resign, both of them to return when American would be "in proper hands."
The evidence reveals that when Kidwell was elected a director of International Pulverizing Corporation, he accepted this position without disclosing to Stackhouse and Andrews his alleged dissatisfaction with the conduct of its affairs.
On October 1, 1935, Kidwell resigned all of his offices in American Pulverizing Corporation and in International Pulverizing Corporation. On November 14, 1935, Stephanoff terminated his relations with the International Pulverizing Corporation.
It is declared on behalf of the plaintiff that shortly after November 14, 1935, Kidwell secured the cooperation of Walter Willoughby and induced him on November 30th to file an application for a United States patent on the Micronizer, and that Willoughby's attorney was supplied by Kidwell with the text of the then pending Andrews patent application, which Kidwell, or Stephanoff at Kidwell's direction, had extracted from the files of International Pulverizing Corporation. The alleged purpose of this action was to induce the declaration by the Patent Office of an interference between Andrews and Willoughby, whereby issuance of the Micronizer patent would be indefinitely delayed.
A further accusation is that on December 2, 1935, Kidwell and Stephanoff entered into a written joint-venture agreement with Whittaker, Clark & Daniels, Inc., confirming a previous oral agreement between these parties, whereby it was agreed that if the Kidwell bloc won the election at the following January meeting of the stockholders, Kidwell's and Stephanoff's inventions of improvements to the Micronizer were to be transferred to the reorganized American Pulverizing Corporation *352 on terms "mutually agreeable," while if they lost the election the joint venturers were to develop a new pulverizing apparatus, and to organize a new corporation to promote such apparatus, stock therein to be issued in the agreed proportionate interests of the parties. This agreement was not disclosed to the American stockholders whose proxies Kidwell and his group were then soliciting.
The evidence does disclose that in the campaign to secure proxies from stockholders of American Pulverizing Corporation to be used at the annual election to be held in January, 1936. Kidwell, Stephanoff, and their associates circulated literature which stated:
"Your committee has been advised by a prominent firm of patent attorneys in New York, that the patent application under which our company is operating is invalid. Mr. Andrews made the application solely in his own name, whereas the law requires that the application must bear the signature of all the inventors.
"This dangerous situation will be remedied by the action of your committee whereby the other inventors of our pulverizing mill have filed an interference patent in the U.S. Patent Office to make our patent valid before it is too late. Your committee plans to place these other inventors on the new Board of Directors in order to keep our patent situation clear and safe."

* * * * * * *
"To proceed to adjust our Patent situation and to make same more secure by the securing of Improvement Patents, through individuals, who will be on the new Board of Directors. Our situation is very serious, in that as soon as the Patents are disclosed, other Patents will be presented as competitors, and we now know of several that will be near if not better than our own."

* * * * * * *
"Mr. Nicholas Stephanoff, formerly chief engineer of our company, is a Mechanical Engineer with the highest reputation. Mr. Stephanoff resigned from the company more than two months ago because he did not wish to risk any further a possible loss of his reputation as an engineer. He has solved many intricate problems in connection with the commercial development of our `Micronizer Reduction Mill.' Mr. Stephanoff has developed several valuable improvements on the `Micronizer' and is at liberty to patent them. This committee has persuaded him to return to the company if we are successful with our plans so that his patentable ideas may not be lost to our company."
The institution of the suit in Chancery on January 3, 1936, one week before the meeting, charging mismanagement of the company, has not eluded my attention.
*353 At the annual stockholders' election of directors on January 10, 1936, the Kidwell-Stephanoff ticket was defeated by 672 to 503 votes.
On January 25, 1936, Stephanoff, at Kidwell's instance, filed applications for United States patents. It is declared that the claims of such applications were so broadly worded as to cover the Micronizer itself and were composed to induce the declaration of an interference between the Stephanoff and Andrews inventions, and hence delay indefinitely the issuance of the patent on the Micronizer.
The Micronizer patent, however, issued on March 3, 1936; and thereafter and on July 15, 1936, an interference was declared between this patent and Willoughby's application. On March 31, 1937, another interference was declared between the said Micronizer patent and Stephanoff's application. Stephanoff filed a written concession of priority of Andrews' inventions and suffered a dismissal of his application on August 4, 1937. Willoughby thereafter abandoned his patent application and suffered a dismissal by default on November 30, 1937.
There is also evidence that the defendants Kidwell and Stephanoff were continuing to mobilize their ideas in an effort to develop a pulverizer mill that would compete with the Micronizer. Stephanoff is said to have then been possessed of a copy of his memorandum of invention dated June 6, 1935. It was undoubtedly their ambition to develop a pulverizing mill sufficiently distinguishable from the Micronizer to enable them to obtain a patent thereon and to project it competitively. They devised a mill for which the application for the patent was filed on June 22, 1936, and the patent was granted on October 22, 1940, to the defendant Materials Reduction Company. Described generally, it consists of a tube in vertical position with straight sections between the upper and lower curved section. The feed injector is located on the outer wall of the tube at the base of one of the straight sections, and the nozzles, in variable number, are on the outer wall of the lower curve below the injector and in the direction of the gas flow. On the inner wall of the upper curve at *354 about the point where that curve merges with and into the straight section on which the injector is located, there is a slot several inches in length to provide an avenue for the discharge and withdrawal of the ground material. The defendant Materials Reduction Company has introduced the mill to the public and is issuing licenses for its industrial use.
On September 1, 1937, one Albert C. Hobbie, at Andrews' direction, filed a patent application on his invention of July, 1935, which showed the spiral flows in his two circular sections moving in opposite directions, and assigned his rights therein to International Pulverizing Corporation. On February 20, 1940. a patent issued on this application to International.
Hobbie's application was later in date than the Stephanoff-Kidwell application and probably motivated by an endeavor to set up an interference. Hobbie's idea was to add to the peripheral wall of the Micronizer two circular sections, one above the other, in which jets would be placed at such angles as to superimpose upon the general rotation of gas and material a spiral motion in each circular section.
Upon the issuance of the Stephanoff-Kidwell patent and the Hobbie patents, the plaintiff did in fact institute an interference proceeding in the United States Patent Office between the defendant's patent and the Hobbie patent. The plaintiff was unsuccessful both in the Patent Office and in the United States District Court on appeal.
In the present case the alleged cause of action of the plaintiff is that the Stephanoff-Kidwell patent of the defendant was the product of the conceptions of Stephanoff formulated while he was employed by the plaintiff and engaged to develop and improve the Andrews Micronizer, and it is to support that allegation that the essential similarity between the conception evidenced by the Stephanoff Memorandum and the invention patented by the defendant is sought to be established.
The problem of resemblance or variation, of correspondence or novelty, in their technical and scientific objectivity and operation challenges the intelligence of those trained in the field of aerodynamics. The testimony relating to this footing *355 of the case has been profuse and illuminating. The experts, as too often happens, disagree leaving the problem, as Tennyson might say, dark with excessive brightness.
Objectively the circular Micronizer and the defendant's elongated mill appear to be structurally unlike. But is the Micronizer as conceivably remodeled by the Stephanoff Memorandum the prototype of the defendant's invention in mode of performance and operation? I take it that similarity of operation, not of function or appearance, is the more significant point. Simply stated, does the defendant's mill perform the same function in so much the same way as clearly to warrant the inference that it was in truth conceived by Stephanoff during the period of his employment by the plaintiff?
There is evidence indicating that the Micronizer, the Stephanoff Memorandum Mill, and the Hobbie Mill all operate primarily on the principle of the so-called sink vortex, whereas the defendant's mill utilizes the principle of double inverse helical flow of air under a continuous pressure force. The inner perimeter of the defendant's mill is closed, which necessitates the return of the air toward the outer perimeter across the central plane of the tube, thus completing the first turn of the double helical flow. The pattern is repeated as long as the curved closed tube continues. It is explained that the inward flow in the plaintiff's mill is that of a sink vortex, spiraling continuously inwardly until discharged at the sink vortex which is the axis of the cylindrical chamber. There is also testimony that the continuous slot around the inner periphery of the annular mill completely destroys a double inverse helical flow of the fluid injected into the ring.
It is acknowledged that a vortical flow occurs in the plaintiff's mill. The defendant denies that there is any such feature as a "sink vortex" in the defendant's apparatus, and asserts moreover that an operational differentiation exists by reason of the continuous inner slot in the plaintiff's mill and the enclosed walls throughout the major portion of the tube in the defendant's mill.
The pressure profiles, the air velocity graphs, the slurry, grinding, and wear tests have been viewed with thoughtful consideration.
*356 Kidwell's testimony engages attention. He declares that it was in January, 1936, and after he and Stephanoff had terminated their services for the plaintiff, that they actively resumed their efforts to devise a pulverizing mill. Kidwell states that he undertook the study of fluid mechanics and that in March, 1936, he and Stephanoff acquired from the deliberative reading of Stodola's work on Gas and Steam Turbines some authentic knowledge of the phenomenon of the double inverse helical flow of fluid in a curved closed tube. He asserts that the defendants' mill eventuated from their cerebrations assembled during that period.
Stephanoff has since become estranged from Kidwell. The plaintiff has relied principally upon him for proof of the existence of the Memorandum of June 6, 1935, notwithstanding he was joined as a party defendant. It is my understanding that the mill in the form and style suggested by the Stephanoff Memorandum has never been used commercially. Stephanoff is a resident of Pennsylvania and was not served with process in this action, and declined to appear personally to testify at the trial. Accordingly I have cautiously measured the credibility of his testimony.
I have, I think, sufficiently and fairly elucidated at least the essence of the present controversy. This, however, is not a case in which the final decision can be erected upon the determination of one or indeed some of the many factual issues. The evidence must be viewed panoramically, and all of the logical and legitimate inference must be congregated within the field of attention.
In doing so I envision distinctly and significantly such considerations as the circle of confidential relationship in which the defendants Stephanoff and Kidwell were associated with the plaintiff; the nature and character of the service they were engaged to perform; the unexposed knowledge and information with which they were entrusted; the study which they undoubtedly devoted to the object of their employment within its duration; the absence of Stackhouse and Andrews in the summer of 1935; the Memorandum of June 6, 1935; the resignations of Kidwell and Stephanoff on October 1, 1935, *357 and on November 14, 1935, respectively; the oral joint venture agreement entered into that same month (November, 1935) which was reduced to writing on December 2, 1935; the suit in Chancery against Stackhouse and Andrews in January, 1936; the endeavor to capture control of the American at the annual election of stockholders on January 10, 1936; the associations of Stephanoff and Kidwell in filing patent applications on January 25, 1936; the interference proceedings; and the application for the defendant's patent on June 20 (or 22), 1936. Often one can follow the parade of events and arrive at the truth.
The hostile motives of Stephanoff and Kidwell during that short span of time are manifest, and the expedition with which they claim to have conceived the defendant's invention after the termination of their employment is, in the light of their other intervening activities, improbable and incredible.
A more plausible explanation comes from the circulars dispatched by Kidwell, Stephanoff, and their associates before the annual stockholders' election on January 10, 1936. I have in mind the following excerpts:
"Our situation is very serious, in that as soon as the Patents are disclosed, other Patents will be presented as competitors, and we now know of several that will be near if not better than our own."

* * * * * * *
"Mr. Nicholas Stephanoff, formerly chief engineer of our company, is a Mechanical Engineer with the highest reputation. Mr. Stephanoff resigned from the company more than two months ago because he did not wish to risk any further a possible loss of his reputation as an engineer. He has solved many intricate problems in connection with the commercial development of our `Micronizer Reduction Mill.' Mr. Stephanoff has developed several valuable improvements on the `Micronizer' and is at liberty to patent them. This committee has persuaded him to return to the company if we are successful with our plans so that his patentable ideas may not be lost to our company."
Contractually the plaintiff was entitled to Stephanoff's solutions "of intricate problems in connection with the commercial development of our (plaintiff's) Micronizer Reduction Mill," to the "several valuable improvements" developed by him and "his patentable ideas" formulated during the *358 period of his employment. Stephanoff very frankly acknowledges that to be true, yet in the circular transmitted to the stockholders a few weeks after the termination of his employment, he and Kidwell announced that he, Stephanoff, was "at liberty to patent" the problems he had solved, the valuable improvements he had developed, and the patentable ideas he had conceived.
Mindful that Stephanoff relinquished his employment on November 14, 1935, it is observed that only eighteen days later he and Kidwell executed an agreement in writing in which the following significant phrases are embodied:
"We guarantee that we have no Contract or Agreement with International Pulverizing Corporation or American Pulverizing Corporation, to assign over to them, any inventions, past, present and future. * * *
"If, as a result of the Annual Election of Directors of American Pulverizing Corporation, to be held in the early part of January, 1936, we should be returned to responsible positions, in American Pulverizing Corporation, together with other Complainants, including Walter J. Willoughby and Edwin H. Somner, we would be willing to make available to American Pulverizing Corporation, on terms mutually agreeable, any new developments that we may have attained.

* * * * * * *
"We further accept, that Whittaker, Clark & Daniels, Inc. are not to finance or to be a party to our possible inventions; but will test out any completed unit that we may have assembled." (Italics mine in all instances.)
It remains for me to divulge my deductions from the evidence. I perceive no precarious uncertainty in finding that the defendants Stephanoff and Kidwell were at least impliedly employed by the plaintiff to invent, or more particularly to develop for the plaintiff a more efficient pulverizing apparatus. It was understood that their beneficial discoveries in that pursuit should be the property of the plaintiff.
During the period of his engagement Stephanoff if not with the aid, certainly with the knowledge of Kidwell, conceived in the exercise of his inventive talents an advantageous improvement of the micronizer. It was that circumstance that motivated Stephanoff and Kidwell in the catenation of the immediately ensuing events. Characteristically, they aspired *359 to obtain a substantial share of the fruits of their accomplishments. They resolved to achieve that objective with or without the plaintiff  with the plaintiff "on terms mutually agreeable," or in association with Whittaker, Clark & Daniels, Inc. Their endeavors to capture a favorable control of the American and in effect of the plaintiff were vigorous and courageous, but unsuccessful. I doubt that the expenditure of such efforts would have been warranted unless Mr. Stephanoff had "solved many intricate problems in connection with the commercial development of our `Micronizer Reduction Mill'" and had "developed several valuable improvements on the `Micronizer'."
The sharp question of fact in this case is whether the defendant's mill is the substantial embodiment of the micronizer and the improvements conceived by Stephanoff during the period of his employment by the plaintiff, or the product of afterthought. The determination of that factual element must, as I have stated, be derived from a comprehensive observation and consideration of the entire evidence.
Obviously this action cannot properly be characterized as a patent or patent infringement case. It is enough for me to state that when entwined with all of the evidence and its acceptable inferences, the similarity of the operations and functions of the mills, such as it is, contributes in some significant degree to the proof of the plaintiff's cause of action.
Although the circumstances are distinguishable, this case is essentially in balance with Marcalus Mfg. Co. v. Sullivan, 142 N.J. Eq. 434, 60 A.2d 330.
Judgment for plaintiff.