SENDELBACH v. GILLETTE.

PATENTS; INTERFERENCE; BURDEN OF PROOF; EMPLOYER AND EMPLOYEE;
PRESUMPTIONS.

1. Not only is the burden of proof upon the applicant who is in interference
with a prior patentee, but that burden can only be discharged by his
establishing by proof, beyond a reasonable doubt, that he is the real
prior inventor of the structure of the issue, and thus clearly over-
coming the patented claim of his rival.
2. If the work of one employed by another embodies invention as dis-
tinguished from mechanical skill, its results cannot be successfully
claimed by the employer, except where there has been an agreement
that such completed invention, or the patent therefor, shall issue for
the benefit of the employer.
3. An inventor cannot be deprived of the right to his invention, where he
has used due diligence in the assertion of his right, except by express
contract, or by a course of conduct that fairly gives rise to an impli-
cation of an intention to part with or dispose of the right; and a
presumption to that effect is not lightly to be made.
4. In an interference involving an improvement in wheel-hubs, between
an applicant and a prior patentee, where the applicant, who had pre-
viously obtained two patents for roller bearings adjustable to hubs of

wheels, claimed that he communicated the invention of the issue to the patentee, who was the vice-president of a wheel company, for the purpose of having the company construct some wheels embodying his invention, the testimony examined and reviewed and, reversing the decision of the Commissioner of Patents, *held* insufficient to establish beyond a reasonable doubt that the applicant disclosed his invention to the patentee.

5. The action of the Patent Office in granting a patent is presumptively correct, and a charge by a rival inventor that the patentee fraudulently and surreptitiously obtained it can only be sustained by the clearest and most undoubted proof.

6. While a delay of over two years in making an application after the applicant has completed the invention and put it in working operation, and of about six months after another applicant has received a patent for the same invention, will not of itself be conclusive as against the applicant, in an interference between him and the patentee, it is a circumstance of considerable significance in connection with the other facts of the case.

No. 229. Patent Appeals. Submitted May 13, 1903. Decided June 2, 1903.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case. *Reversed.*

The facts are sufficiently stated in the opinion.

*Mr. George P. Whittlesey* and *Mr. Melville Church* for the appellant.

*Mr. Fred L. Chappell* for the appellee.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

This is an appeal from the Patent Office, taken by Edward Sendelbach from the decision of the Commissioner of Patents made in the matter of interference between the application of Herbert B. Gillette, filed January 3, 1901 and the patent No. 651,276, issued to Sendelbach June 5, 1900, on application filed March 9, 1900, relating to vehicle hubs. The interference is No. 21,180.

The issue is in two counts, framed in the following terms:

"1. As a new article of manufacture, a wooden center for a hub, consisting of a short cylindrical block having ends lying in plane at right angles with its axis, radial mortises for the spoke tenons, a central longitudinal bore, and metallic bands encircling it at its ends, said bands lying entirely outside of the line of the spoke mortises.

"2. The combination with a wooden center having radial mortises and flat ends lying in plane at right angles with the axis of the hub, of a metallic box provided with a collar fitting against one end of said center, a metallic sleeve surrounding said box and having a flange fitting against the other end of the center, means for clamping said parts together, lengthwise, and spokes inserted into the mortises in said center and sustained against lateral pressure by the wooden center only."

These counts are framed in the precise terms of two of the claims contained in the patent issued to Sendelbach.

The invention is of a narrow or limited character. It has reference rather to the form and clamping of the hub than to other improvements. The hub as part of a vehicle wheel is an old mechanical structure, and the present invention would seem designed to secure, by way of improvement of the hub heretofore in use, superior compactness, strength, and elasticity.

The examiner of interferences, and the board of examiners-in-chief, have, upon examination of the facts in proof, concurred in the conclusion that Sendelbach was entitled to priority, or rather was the original inventor of the subject-matter of the issue. But this decision of the two tribunals was reversed on appeal by the Commissioner of Patents, who held that what Sendelbach did was the result of his employment by Gillette, and amounted to nothing more than the perfection by him, as a mechanic, of what had been disclosed to him by Gillette; and that, under well-settled rules of law, Gillette was and is entitled to be regarded as the real inventor of the matter of the issue.

Sendelbach being the senior party and a patentee, his patent bearing date June 5, 1900; the burden of proof is upon Gillette, the subsequent applicant, whose application was not filed until near about seven months after the issue of the patent to Sendel-

bach, and about ten months after the filing of the application upon which the patent was issued. The burden of proof is not only upon Gillette, but that burden can only be discharged by establishing by proof, beyond any reasonable doubt, that he is the real prior inventor of the structure of the issue, and thus clearly overcoming the patented claim of Sendelbach.

In Gillette's preliminary statement, made under oath, it is set forth that the applicant conceived the invention in issue during the first week in June, 1898; that the invention was first disclosed by him to others during the first week in June, 1898; that during the last week of June, 1898, a drawing of the invention was prepared; that a model of the invention was made early in June, 1898; that the invention was first embodied in a complete working wheel about the 5th of September, 1898, and that the wheels completed at that time were operated successfully about the 15th of September, 1898; and this invention was reduced to practice about the last mentioned date, by the use of a full sized working wheel, and which wheels have been placed in the market to the extent of 320 wheels.

It appears that Gillette had applied for and obtained two patents for roller bearings, adjustable to hubs of wheels,—the first of which, No. 643,122, dated February 13, 1900, was granted upon an application filed September 15, 1899; and the second, No. 644,550, dated February 27, 1900, was granted upon an application originally filed June 30, 1899, and renewed February 2, 1900. Neither of these patents, however, can be construed to embrace the narrow invention described in either the first or second count of the present issue; though there is, in several particulars, similarity of parts in count two of the present issue to parts described in the first patent issued to Gillette, No. 643,122, dated February 13, 1900. In that patent, however, as said in the opinion of the examiners-in-chief, the grant "purports to be for and the claims cover a roller-bearing for vehicle hubs, but the drawing discloses and the specifications describe a hub-structure which, if it were not for the considerable length of the wooden body-portion, might be regarded as a center for a hub. This wooden body-portion is combined with a

metallic box F provided with a collar C screwed onto it and fitting against one end of said body, with a metallic sleeve (the screw-threaded portion of the plate E) surrounding said box and having a flange E fitting against the other end of said body, and with means (the bolts K) for clamping said parts together, lengthwise, all as specified in count two."

The examiners-in-chief, in further examination of the facts, with comment thereon say:

"Sendelbach's patent, which contains claims in the exact terms of the counts of the present issue, was applied for nearly a month after the aforesaid patent to Gillette was granted, and hence, if valid, must cover something that is not shown or described by Gillette. That something, as appears upon an examination of Sendelbach's specification, is 'a wooden center, which is substantially the old wooden hub with its ends cut off,' and which, because the associated encircling bands and clamping end flanges are situated close to the wooden sockets for the spokes, is directly and materially reinforced by metal, so that the spokes may be forcibly driven into their sockets without splitting the wooden center.

"The issue then involves, as an essential feature of the construction, the relative diametrical and longitudinal dimensions of the wooden portion of the hub, and excludes any such construction as is disclosed in the patent to Gillette, above mentioned.

"This conclusion is of great importance in its relation to the fact of priority, for one of the main contentions of Gillette is that Sendelbach is not an original inventor of the subject-matter of either count of the issue, because he, Gillette, disclosed to Sendelbach, prior to the date of his alleged conception, the substantial features of the invention in controversy.

"Gillette visited Sendelbach, who is vice-president of the Standard Wheel Company of Terre Haute, Indiana, sometime in December, 1899, or January, 1900, for the purpose of having said company construct some wheels. Sendelbach's alleged conception occurred on January 23, 1900. Gillette testifies that, at this time, he showed Sendelbach two models which are in

evidence as 'Gillette's Red Model,' and 'Gillette's Second Structure'. He admits that no drawings were made during the interview. Sendelbach claims to have seen only the red model, which, it may be remarked, is an embodiment of the construction of Gillette's patent No. 644,550, granted February 27, 1900. Neither of these models has any bearing upon the question at issue except as they tend to show that Gillette did not disclose the invention of the issue to Sendelbach during the said visit. The red model is a spokeless wheel provided with roller bearings which contain clamping plates, but it affords no suggestion of the present specific invention. The second structure model is nothing but a cylindrical tube provided with a removable flanged collar at each end. These elements might be a part of any one of a number of different structures, and hence the model cannot be considered as a thing which, when shown to Sendelbach, conveyed to him any definite idea of the invention of the issue.

"In view of these facts it is plain that Sendelbach's lack of originality is not proved by the evidence relied on for that purpose."

On appeal, the Commissioner of Patents held, that the relation of employer and employee existed as between Gillette and Sendelbach from the time of the interview had at Terre Haute, in December, 1899, or January, 1900, and that, by reason of the communication then made by Gillette to Sendelbach, the former became entitled to the invention embodied in the patent subsequently issued to Sendelbach, as the true original inventor of the subject-matter of that patent. That what Sendelbach did in the structure of the hub was purely mechanical, and was only the mechanical structure of the invention of Gillette, which had been communicated to Sendelbach for purposes of construction; and that Gillette was in no manner devested of his right of invention by what was done by Sendelbach. This is the ground upon which the Commissioner's decision is based in favor of Gillette. If this ground is not tenable upon the facts of the case, then it is not denied that the claim of Gillette is without sufficient support, as against the patent of Sendelbach.

As bearing upon this question, what are the principles of the
patent law that govern in such cases, and to which Gillette must
show his case to conform? The law upon the subject is well
settled by repeated decisions of the Supreme Court of the United
States. Where a party claims an invention, and also to have
communicated that invention to another, who has applied
mechanical work thereto, and put such invention into practice,.
claiming the same as his own, the communication, in order to
be effectual, must be shown to have been full and clear as to all
the essential elements of the invention, and such as was suffi-
cient in itself to enable the party to whom the disclosure was
made to give the invention practical form and effect without the
exercise of invention on his part. In other words, his work,.
in giving form and effect to the invention communicated, must
be nothing more than the exercise of mechanical skill, as ap-
plied to the subject-matter. If the work embodies invention,.
as distinguished from mechanical skill, it cannot be successfully
claimed by another, except where there has been an agreement
that such completed invention, or the patent therefor, shall issue
for the benefit of the party making the communication. Robin-
son, Patents, §§ 84 and 324, and notes.

In the case of *Hapgood* v. *Hewitt,* 119 U. S. 226, 30 L. ed.
369, 7 Sup. Ct. Rep. 193, this question was fully considered by
the Supreme Court. That was a suit in equity by the trustees of
a dissolved corporation to compel an employee of the corporation
to convey to the plaintiffs the title to letters patent obtained by
him for an invention made while he was in their employ, and dur-
ing the time they were entitled to his services. But it not appear-
ing from the facts as set out in the bill that there was any agree-
ment, between the employee and the corporation, that the latter
was to have the title to or any interest in the invention, or in
the patent therefor, it was held upon demurrer, that the com-
plainants were not entitled to what they claimed in the bill.

In that case, the decision of the circuit court (11 Biss. 184,.
11 Fed. 422) was placed on the grounds (1) that Hewitt was
not expressly required by his contract of employment to exer-
cise his inventive faculties for the benefit of his employer, and

there was nothing in the facts alleged from which it could be fairly inferred that he was required or expected to do so; (2) that whatever right the employer had to the invention by the terms of Hewitt's contract of employment was a naked license to make and sell the patented improvement as a part of its business, which right, if it existed, was a mere personal one, and not transferable, and was extinguished with the dissolution of the corporation.

The decision of the circuit court was held to be correct by the Supreme Court, the latter court saying: "We are of opinion that the views taken of the case by the circuit court were correct. There is nothing set forth in the bill as to any agreement between the corporation and Hewitt that the former was to have the title to his inventions, or to any patent that he might obtain for them. The utmost that can be made out of the allegations is that the corporation was to have a license or right to use the inventions in making ploughs. It is not averred that anything passed between the parties as to a patent."

This case shows very clearly that an inventor cannot be deprived of the right to his invention, where he has used due diligence in the assertion of his right, except by express contract, or by a course of conduct that fairly gives rise to an implication of an intention to part with or dispose of the right; and a presumption to that effect is not lightly to be made.

The case of *Agawam Woolen Co.* v. *Jordan,* 7 Wall. 583, 19 L. ed. 177, is a case often referred to, and has a special bearing upon the present controversy in several respects. That was the case of a bill in equity for infringement, the defense to which, among other things, was that the combinations set forth in the several claims of the patent were first invented by one Winslow, and that neither of them was original with assignor of the complainant. In that case it was held that a defense, "that the patentee fraudulently and surreptitiously obtained the patent for that which he knew was invented by another," was not a sufficient defense to a charge of infringement, unless accompanied by the further allegation that the alleged first inventor was, at the time, using reasonable diligence in adopting and perfecting the

invention. And further; that the inventor who first perfects
a machine, and makes it capable of useful operation, is entitled
to the patent.

The learned Justice Clifford, who delivered the opinion in
that case, said: "They do not pretend that he [Winslow] in-
vented or even suggested the entire invention, nor all of the sev-
eral elements embraced in any one of the separate combinations,
as expressed in the claims of the patent; and if they did, it could
not for a moment be sustained, as it finds no support whatever
in the evidence. None of the devices described in the specifi-
cations are new, but the claims of the patent are for the several ·
combinations of the described elements arranged in the man-
ner set forth, and for the purpose of working out the described
results. Regarded in that light, it is clear that the concession
that the person named [Winslow] did not invent nor suggest
the entire invention, nor any one of the separate combinations,
is equivalent to an abandonment of the proposition under con-
sideration, as it is clear to a demonstration that nothing short
of that averment can be a valid defense." And further on the
court say: "Persons employed, as much as employers, are en-
titled to their own independent inventions, but where the em-
ployer has conceived the plan of an invention, and is engaged in
experiments to perfect it, no suggestions from an employee, not
amounting to a new method or arrangement, which, in itself,
is a complete invention, is sufficient to deprive the employer of
the exclusive property in the perfected improvement. But
where the suggestions go to make up a complete and perfect
machine, embracing the substance of all that is embodied in
the patent subsequently issued to the party to whom the sug-
gestions were made, the patent is invalid, because the real in-
vention or discovery belonged to another."

The purport of the defense in that case, as declared by the
court, was that the invention was made by Winslow, and not by
the assignor of the complainant, and in regard to such defense
the court said: "The settled rule of law is, that whoever first
perfects a machine is entitled to the patent, and is the real in-
ventor, although others may previously have had the idea and

made some experiments towards putting it in practice. He is the inventor, and is entitled to the patent, who first brought the machine to perfection, and made it capable of useful operation. *Washburn* v. *Gould,* 3 Story, 133, Fed. Cas. No. 17,214."

It was further said in that case that "suggestions from another, made during the progress of such experiments, in order that they may be sufficient to defeat a patent subsequently issued, must have embraced the plan of the improvement, and must have furnished such information to the person to whom the communication was made, that it would have enabled an ordinary mechanic, without the exercise of any ingenuity and special skill on his part, to construct and put the improvement in successful operation." In other words, the communication must embrace a complete invention.

But these general principles are to be taken with this qualification, that "no one is entitled to a patent for that which he did not invent unless he can show a legal title to the same from the inventor, or by operation of law; but where a person has discovered an improved principle in a machine, manufacture, or composition of matter, and employs other persons to assist him in carrying out that principle, and they, in the course of experiments arising from that employment, make valuable discoveries ancillary to the plan and preconceived design of the employer, such suggested improvements are in general to be regarded as the property of the party who discovered the original improved principle, and may be embodied in his patent as a part of his invention."

Now in view of these principles, the question is, as matter of fact, whether there was a communication made by Gillette to Sendelbach, in respect to the invention of the present issue, before the application made by Sendelbach to the Patent Office for the patent that issued to him; and if such communication was made, whether it was of such special character as to the combination of parts as to have enabled a mechanic of ordinary ingenuity and skill, in that particular trade or calling, to have constructed and put the improvement in successful operation, as described in the issue. Unless such state of facts be shown, the

contention on the part of Gillette, as to the alleged result of the communication to Sendelbach, cannot be sustained.

In his testimony, Gillette gives the following statement of what was disclosed to Sendelbach in the interview at Terre Haute:

"*Q.* When you had your interview with Sendelbach at Terre Haute, what invention was it that you explained to him at that time, and in what way did you explain it?

"*A.* Well, he had this structure before him (pointing to red model) and also this structure (pointing to structure No. 2).

"*Q.* In showing these models, what particular feature of the construction did you call Sendelbach's attention to?

"*A.* Well, I called his attention to the fact that in the order for wheels, I wanted the flanges extended up to the outer diameter so that I could have the hub cut off just outside the hub band of an ordinary wooden hub. I ordered those flanges made that way so that I could cut the ordinary hub off all spoke wheels and put these flanges on to the surfaces there. But the structure that I would adopt as a standard would be with this extension of the flange here, and carried out in front here, to form part of the hub. I made that with just a pencil sketch, nothing more than this. Just so he could get a clear idea of what I wanted."

This is certainly not very clear, and the meaning intended to be conveyed is of questionable import.

He was asked whether he called Sendelbach's attention to his roller bearing inventions. To which he replied: "Well, now I could not say. Of course, I was enthusiastic with the roller-bearing proposition, and talked with him about it, and what I believed could be done with it. He also talked to me on the same line, and made the remark that with this structure he believed that I could control the wheel business of the world." He further stated that he ordered the wheels for the purpose of supplying the demand for spoke wheel lumber carts, for which he was receiving orders.

It is true, Gillette says, that Sendelbach's attention was called to the red model and to structure No. 2; and also to the fact that,

in the order for the wheels he wanted the flanges extended so that he could have the hub cut off just outside the hub band of any ordinary wooden hub.

But he says the structure that he would adopt as a standard would be with the extension of the flange here, and carried out in front to form a part of the hub. He says he made a pencil sketch of this, and nothing more, so that Sendelbach could get a clear idea of what he wanted. But he does not seem to have based his order for wheels, or any communication that he may have made upon the subject, upon any model or drawing before him; he only attempted to make a pencil sketch of what he wanted; and this clearly falls very far short of a full description of all the elements of the invention described in the issue of this case. There seems to have been considerable talk between the parties in respect to the roller-bearing invention of Gillette, but that forms no part of the present issue.

In the testimony of Sendelbach, he especially denies that Gillette ever imparted to him any information whatever with respect to the invention which forms the subject-matter of this interference; [and says] that he, Sendelbach, received no disclosure in any form from Gillette which conveyed to him the invention which he claims in his patent. He says that the red model was the only exhibit shown him at the interview referred to, and in this he is corroborated by the testimony of Ruth Way. He says that Gillette tried to make a sketch of what he wanted, but he gave it up and said he would send a blue print upon his return home. The blue print was received, but not until about April 12th or 13th thereafter. Sendelbach says he understood that the wheels were to have the old-fashioned long wood hub, and that was the wheel Gillette explained to him. This statement would seem to derive considerable support from the fact that the blue print sent to the Standard Wheel Company shows an old fashioned wood hub, about nine inches long, and nine inches in diameter, and provided with point-band, butt-band and two spoke bands lying close to the spokes. The hub is fitted with a box on which are loose end flanges countersunk into the ends of the hub. The box and flanges seem to be the same as Gil-

lette's "Second Structure." Between the box and the axle bearing is a set of cylindrical rollers. This is what is shown by the copy of the blue print as it appears in the brief of the appellant, which we assume to be correct. In the letter to the Standard Wheel Company( accompanying the blue print, it is stated that the hubs are to be eight inches long, and that a set of flanges would be sent to the company to be used in the construction of a sample wheel. These flanges were sent and received about the middle of May, 1900. They embodied the same structure as that shown in the blue print previously sent. It is very clear the blue print and the letter accompanying the same did not describe the structure of the hub described in the patent subsequently issued to Sendelbach, and described in the issue of the interference.

In the preliminary statement of Gillette he states that he made a drawing of his invention, or had a drawing thereof made, in June, 1898, and, about the same time, a model was also made; and that the invention was embodied in a complete working wheel about the 5th of September, 1898, and that the wheels were successfully operated about the 15th of September, 1898. With the invention thus completed, it is rather remarkable, if it be the same as that described in the present issue of interference, that it was not shown in the blue print, and specifically referred to in the letter sent with the blue print. Moreover, there is no reason assigned for the delay, and the apparent want of diligence in making application for the patent, if the invention was completed as stated; as the application was not made until January 3, 1901,—nearly two years and four months after the invention was completed and put in working operation, and about six months after the patent granted to Sendelbach. We do not say that this delay would be conclusive of itself to defeat the application of Gillette; but it is a circumstance of considerable significance when considered in connection with the other facts of the case.

In view of all the facts of the case, it is impossible to conclude that Gillette has established beyond reasonable doubt that his claim to the invention described in the present issue of interference is prior and superior to the claim of Sendelbach to that in-

vention, and which is covered by the patent issued to the latter; or that Sendelbach's claim to the invention of the patent is founded upon disclosures made to him by Gillette. The decision made in the Patent Office in allowing the claim and issuing the patent to Sendelbach is presumed to be correct; and the charge that the patentee fraudulently and surreptitiously obtained the patent for an invention which he well knew belonged to another can only be sustained by the clearest and most undoubted proof. Upon careful examination of all the facts and circumstances of this case, we are brought to the conclusion that there is error in the decision of the Commissioner, and that the right of priority belongs to Sendelbach. We therefore reverse the decision of the Commissioner, and direct the proceedings and this decision to be certified to the Commissioner of Patents as directed by the statute.                    *Decision reversed.*

A motion for a rehearing by the appellee filed June 17, 1903, was on June 26, 1903, continued until the October term of the court and was denied February 2, 1904.